**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
BIG STONE GAP DIVISION**

| | | |
|---|---|---|
| **JESSICA D. LANE,** | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 2:14cv00023** |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | **MEMORANDUM OPINION** |
| **Acting Commissioner of** | ) | |
| **Social Security,** | ) | **BY: PAMELA MEADE SARGENT** |
| **Defendant** | ) | **United States Magistrate Judge** |

*I. Background and Standard of Review*

Plaintiff, Jessica D. Lane, ("Lane"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that she was not eligible for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423 and 1381 *et seq.* (West 2011 & West 2012). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge by transfer based on consent of the parties pursuant to 28 U.S.C. § 636(c)(1). Oral argument has not been requested; therefore, the matter is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as

"evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Lane protectively filed her application for DIB and SSI on February 25, 2011, alleging disability as of July 27, 2010,[1] due to Arnold-Chiari malformation,[2] degenerative disc disease of her spine, bipolar disorder, depression, severe anxiety, severe stress and problems with her knees. (Record, ("R."), at 256-269, 286, 291.) The claims were denied initially and on reconsideration. (R. at 101-14, 115-28, 131-60, 171-73, 178-80, 184-87, 189-91, 192-94, 196-98.) Lane then requested a hearing before an administrative law judge, ("ALJ"). (R. at 199-200.) A hearing was held by video conferencing on February 1, 2013, at which Lane was represented by counsel. (R. at 37-69.)

By decision dated March 5, 2013, the ALJ denied Lane's claims. (R. at 21-34.) The ALJ found that Lane met the nondisability insured status requirements of

---

[1] Lane filed previous claims for DIB and SSI, which were denied by ALJ opinion dated July 26, 2010. (R. at 73-89.) The Appeals Council denied her request for review, (R. at 95-99), and Lane did not appeal that decision. (R. at 40-41.)

[2] Arnold-Chiari deformity is a congenital deformity in which the cerebellum and medulla oblongata in the brain protrude down into the spinal canal. *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, ("Dorland's"), 434 (28th ed. 1994).

the Act for DIB purposes through December 31, 2012. (R. at 24.) The ALJ also found that Lane had not engaged in substantial gainful activity since July 27, 2010, her alleged onset date.[3] (R. at 24.) The ALJ found that the medical evidence established that Lane suffered from severe impairments, namely generalized anxiety disorder, social phobia, major depressive disorder, bipolar disorder, borderline personality disorder, provisional diagnosis of somatization disorder, post-traumatic stress disorder, status-post Chiari malformation decompression surgery, left knee disorder, mild back disorder, history of sprained ankles and right hand fracture, but he found that Lane did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 24.) The ALJ found that Lane had the residual functional capacity to perform sedentary[4] work that would allow her to change positions briefly between sitting and standing, that would not require walking or standing for more than 15 minutes at a time, did not require her to climb, kneel or operate foot controls, no more than occasional stooping or crouching and that allowed frequent, but not constant, reaching, handling and fingering. (R. at 26.)

---

[3] Therefore, Lane must show that she became disabled between July 27, 2010, the alleged onset date, and December 31, 2012, in order to be entitled to DIB benefits. Lane must show that she became disabled between July 27, 2010, and March 5, 2013, in order to be entitled to SSI benefits.

[4] Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking or standing is often necessary in carrying out job duties. Jobs are sedentary if walking or standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. §§ 404.1567(a), 416.967(a) (2015).

The ALJ also found that Lane should avoid heights and machinery and was limited to short, simple instructions with no close proximity to crowds of unfamiliar persons. (R. at 26.) The ALJ found that Lane was unable to perform any of her past relevant work. (R. at 32.) Based on Lane's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ also found that other jobs existed in significant numbers in the national economy that Lane could perform, including jobs as an assembler and an inspector. (R. at 32-33.) Thus, the ALJ found that Lane was not under a disability as defined by the Act and was not eligible for DIB or SSI benefits. (R. at 33-34.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2015).

After the ALJ issued his decision, Lane pursued her administrative appeals, but the Appeals Council denied her request for review. (R. at 1-5, 348-51.) Lane then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2015). The case is before this court on Lane's motion for summary judgment filed January 13, 2015, and the Commissioner's motion for summary judgment filed April 20, 2015.

## *II. Facts*

Lane was born in 1984, (R. at 87), which classifies her as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). She graduated high school and attended one year of college classes. (R. at 88, 279-84, 292.) Lane testified that

she had an infant daughter, but her physical problems made it difficult to perform such tasks as lifting, bathing and changing her. (R. at 45.) Lane was convicted of theft and distribution of Lortab in 2011 and served a couple of months in jail. (R. at 46.)

Lane testified that she could not return to her past relevant work as a cashier because her knees hurt if she stood for too long. (R. at 48.) She said that she could not return to her past job at a call center because her hands would cramp if she typed for too long and her eyes would hurt from looking at a computer screen for too long.(R. at 48.) Lane testified that she suffered from a "spinning" sensation in her head almost every day and that she would have to lie down and go to sleep to recover from it. (R. at 51.) Lane said that these spells were often accompanied by a headache. (R. at 51-52.) Lane said that, if she sat, her back would start hurting, and, if she stood for too long, her left knee would swell. (R. at 52.) She also said that her knee had given away on her causing her to fall numerous times. (R. at 52-53.) Lane also testified that she had been in counseling for years for problems sleeping, panic attacks, difficulty being around crowds and crying spells. (R. at 53-56.)

Asheley Wells, a vocational expert, also was present and testified at Lane's hearing. (R. at 65-68.) Wells was asked to consider a hypothetical individual of Lane's age, education and work history, who was able to perform sedentary work with a sit-stand option, with no climbing, kneeling and use of foot controls and no more than occasional shifting and crouching. (R. at 66.) The ALJ also asked Wells

to assume that this person should avoid heights and dangerous machinery, could perform frequent, but not constant, reaching, handling and fingering, and could follow short, simple instructions with no close proximity to crowds of unfamiliar persons. (R. at 66.) Wells stated such a person could perform the jobs of an assembler[5] and an inspector. (R. at 66-67.) Wells stated that these jobs would not require a person to stand or walk more than 15 minutes at a time. (R. at 67.) Wells stated that there would be no jobs available should the individual be absent two times per month. (R. at 67.)

In rendering his decision, the ALJ reviewed medical records from Indian Path Medical Center; University of Virginia Health Systems; Clinch River Health Services; Welmont Holston Valley Medical Center; B. Wayne Lanthorn, Ph.D.; Karen Odle, a licensed professional counselor; Mountain View Medical Center; Heart Center; 1st Step Rehab; Dan Levesque, D.C.; Wise County Behavioral Health Services; Clinch River Pharmacy; Wal-Mart Pharmacy; Weber City Drug Center; Food City Pharmacy; Johnson City Medical Center; Lonesome Pine Hospital, Frontier Health; Woodridge Hospital; Norton Community Hospital; Dr. Felix Shepard, Jr., M.D.; Holston Valley Imaging Center; Washington County Medical Center; Dr. Eric Parks, M.D.; Solutions Counseling, LLC; Dr. Jeffrey Marchessault, M.D.; Kaye Weitzman, a licensed clinical social worker; Cardiovascular Associates; and Watauga Orthopedics. Lane's attorney also submitted additional medical records from Robert S. Spangler, Ed.D.;

---

[5] The hearing recording is not audible at this point, but the DOT Listing cited, 713.687-018, is for an assembler job.

Cardiovascular Associates; Watauga Orthopedics; Washington County Medical Clinic; and Clinch River Health Services, Inc., to the Appeals Council.[6] Much of this medical evidence is for treatment rendered before Lane's July 26, 2010, alleged onset date, but it is included where relevant with regard to her ongoing impairments.

Lane presented to the Emergency Department at Lonesome Pine Hospital, ("Lonesome Pine"), on May 2, 2007, complaining that she had "twisted knee the other day." (R. at 1041-42.) Lane said that she had slipped on a wet surface. (R. at 1041.) The treating physician noted a normal inspection of the knee with some tenderness, and he diagnosed left knee sprain. (R. at 1041-42.) X-rays of Lane's left knee taken at Lonesome Pine on May 12, 2007, showed mild degenerative arthritic changes. (R. at 1040.)

Lane presented to the Emergency Department at Indian Path Medical Center, ("Indian Path"), on February 22, 2008, for complaints of cutting both wrists that night. (R. at 1085.) Lane said that she had been depressed for years. (R. at 1085.) It was noted that Lane had suicidal ideations and had been mutilating herself by cutting her forearms. (R. at 1087.) Lane admitted that she had been smoking three to four marijuana cigarettes a day. (R. at 1087.) The treating physician noted that the cuts on Lane's forearms were only superficial scratches. (R. at 1089.) Lane was

[6] Since the Appeals Council considered and incorporated this additional evidence into the record in reaching its decision, (R. at 1-5), this court must also take these new findings into account when determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.,* 953 F.2d 93, 96 (4th Cir. 1991).

diagnosed with depression and self-mutilation. (R. at 1090.) Lane was transferred to inpatient psychiatric treatment at Woodridge Hospital, ("Woodridge"). (R. at 1088.)

Upon admission at Woodridge on February 22, 2008, Lane told her attending physician, Dr. Maria T. M. Liquete, M.D., that she lived with her parents and worked at Pal's. (R. at 1181.) Lane said that she had suffered from depression and anxiety for years and had become increasingly more depressed over the previous couple of months. (R. at 1181.) Lane said that she had smoked marijuana every day that it had been available since age 19. (R. at 1181.) Lane said that she had plans to shoot herself and recently attempted to smother herself with a pillow. (R. at 1181.) Lane said that she would go into rages at times and break things at home. (R. at 1181.) At other times, her mood was euphoric. (R. at 1181.) She reported decreased appetite and energy recently, but she admitted she suffered from insomnia for the previous two months. (R. at 1181.) Dr. Liquete's physical examination showed no musculoskeletal tenderness, normal range of motion in all extremities with no weakness or atrophy. (R. at 1181.) Dr. Liquete diagnosed bipolar disorder. (R. at 1182.) She placed Lane's then-current Global Assessment of Functioning, ("GAF")[7] score at 30.[8] (R. at 1182.)

---

[7] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

[8] A GAF score of 21-30 indicates "[b]ehavior … considerably influenced by delusions or

In her Psychiatric Evaluation, Dr. Liquete noted that Lane stated that she had a long history of depression and severe mood swings. (R. at 1183.) Lane stated that she would "fly off the handle" for very minor reasons. (R. at 1183.) Lane complained of severe depression, restlessness, racing thoughts and difficulty sleeping. (R. at 1183.) She admitted difficulty expressing her moods to others and said she would often hide how she felt. (R. at 1183.) Lane admitted to smoking marijuana, but she claimed she did so to ease her joint pains rather than because of her moods. (R. at 1183.) Dr. Liquete said that Lane also reported some vague auditory hallucinations. (R. at 1183.)

A February 26, 2008, Discharge Summary from Woodridge states that Lane was admitted on February 22, 2008, from the Emergency Department at Indian Path after cutting her wrists in a suicide gesture. (R. at 1179.) Lane complained of increasing depression over the previous couple of months. (R. at 1179.) She stated that she had cut her wrists on several occasions in the past. (R. at 1179.) Dr. Liquete stated that Lane had multiple superficial scratches on the inner aspects of both forearms. (R. at 1179.) Dr. Liquete stated that Lane had been started on Lithium and Trazodone, was stabilized, and her hospital course was unremarkable. (R. at 1179.) Lane denied any auditory or visual hallucinations. (R. at 1179.) Dr. Liquete diagnosed Lane with bipolar disorder and marijuana abuse. (R. at 1179.)

---

hallucinations OR serious impairment in communication or judgment … OR inability to function in almost all areas…." DSM-IV at 32.

She stated that Lane's GAF score was 50-55[9] upon discharge. (R. at 1179.)

Lane was treated at Wise County Behavioral Health from March 6, 2008, to November 14, 2008, when she requested that her treatment continue with Karen Odle at Clinch River Health Services, Inc., ("Clinch River"). (R. at 970-1005.) Lane was first seen for crisis intervention by Melissa F. "Polly" Easterling on February 29, 2008, upon her discharge from Woodridge. (R. at 1004-05.) Easterling noted that stated that every day she seemed to feel better. (R. at 1004.) Easterling noted that Lane denied any suicidal or homicidal ideations or auditory or visual hallucinations. (R. at 1004.) Lane did report feeling paranoid at times, like people were talking about her behind her back. (R. at 1004.) Lane also admitted that she had used marijuana since her discharge. (R. at 1004.) Lane reported a history of cutting herself and problems controlling her thoughts. (R. at 1004.) Easterling gave a provisional diagnosis of bipolar disorder and cannabis abuse. (R. at 1005.) She assessed Lane as exhibiting paranoia, flight of ideas, depression, anxiety, a history of suicidal ideations and head injuries, decreased appetite and self-mutilation. (R. at 1005.)

Easterling completed an intake assessment on Lane on March 6, 2008. (R. at 994-1001.) Easterling stated that Lane had stable housing with her parents,

_____

9 A GAF score of 41-50 indicates that the individual has "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning...." DSM-IV at 32. A GAF score of 51-60 indicates that the individual has "[m]oderate symptoms … OR moderate difficulty in social, occupational, or school functioning…." DSM-IV at 32.

although she had no income. (R. at 994.) Easterling stated that Lane was "thinking of applying for disability due to knee, head and back injuries from multiple car accidents." (R. at 994.) Lane stated that she had worked at numerous jobs since age 17, but she was unable to hold the jobs for any extended period of time. (R. at 995.) Easterling did note that Lane was a volunteer firefighter, who helped the Dungannon Fire Department with grants and fundraisers. (R. at 995.)

Lane claimed she suffered from hyperinsulinenmia, or too much insulin in her blood stream, which made her blood sugar levels drop, chronic pain and carpal tunnel syndrome. (R. at 995.) Lane said that she had good support from her family and friends and that she spent her time with friends swimming, playing with kids, listening to music, signing and dancing. (R. at 996.) Easterling noted that Lane was able to complete all activities of daily independent living with no intervention. (R. at 997.) She also noted that Lane had experienced significant decompensation in the previous three months, in that she recently had been psychiatrically hospitalized for suicidal thoughts and gestures. (R. at 997.) Lane stated that she was not smoking marijuana "as often as before" and that she would like to quit. (R. at 999.)

Lane saw Dr. Jennifer Wisdom-Schepers, M.D., a psychiatrist with Wise County Behavioral Health, on March 10, 2008, along with Easterling. (R. at 984-87.) Dr. Wisdom-Schepers noted that Lane had recently been discharged for a psychiatric hospitalization for a suicidal gesture of cutting herself. (R. at 984.) Lane reported a history of mood swings, including anger, depression and

happiness, lasting from a few days to a month. (R. at 984.) Lane reported feeling better since beginning treatment with Lithium and Trazodone. (R. at 985.) Lane reported that she drank alcohol and smoked marijuana on occasion. (R. at 984.) She said that she smoked an average of one joint every two days for pain and to make herself "hyper and giggly." (R. at 984.)

Lane claimed a history of multiple suicide attempts, including one when she was three years old when she tried to smother herself with a pillow after being beaten by her father. (R. at 984.) Lane stated that she had cut her wrists before and had thought of hanging or shooting herself. (R. at 984.) She stated that she had gone as far as buying a gun. (R. at 984.) Lane said that she had treated briefly with a therapist when she was 19. (R. at 984.) Lane said that she suffered from hyperinsulinemia and multiple joint problems due to a history of multiple traumatic events including motor vehicle accidents, horse accidents and physical abuse. (R. at 984.) Lane claimed that she was physically and sexually abused as a child. (R. at 984.) She said that she was seeking disability benefits based on her physical problems. (R. at 984.)

Dr. Wisdom-Schepers stated that Lane was alert and oriented, calm and cooperative and made good eye contact. (R. at 984.) She noted no abnormal mannerisms, her speech was fluent, and psychomotor activity was normal. (R. at 984-85.) Lane reported that her mood was good, and Dr. Wisdom-Schepers noted that Lane's affect was euthymic with no symptoms of psychosis or gross cognitive impairment. (R. at 985.) Dr. Wisdom-Schepers diagnosed Lane with bipolar

disorder, not otherwise specified; and cannabis abuse. (R. at 985.) She placed Lane's then-current GAF score at 65,[10] with her highest score in the past year being unknown. (R. at 985.) Dr. Wisdom-Schepers "strongly encouraged" Lane to reconsider applying for disability given her age and the fact that she was "not psychiatrically disabled" in her opinion. (R. at 985.) Lane revealed that she was seeking disability because her younger brother had Down Syndrome, and her parents had requested that she assist with his care. (R. at 985.) Lane was advised to continue taking Lithium and Trazodone, but to discontinue the use of marijuana or alcohol while on Lithium. (R. at 985.)

Lane also saw Easterling on this date and reported that she had been doing good. (R. at 987.) She stated that her medications were working well with no side effects and that with each passing day she felt less depressed and teary. (R. at 987.) Easterling noted that Lane denied any suicidal or homicidal ideations or auditory or visual halluncinations, was alert and oriented, her thought process was clear and goal-directed, her speech was unremarkable, her mood was euthymic with congruent affect, her interactions were friendly and appropriate, her hygiene was good, and she maintained good eye contact. (R. at 987.) Easterling noted that Lane appeared to be stable. (R. at 987.)

Easterling completed a DSM-IV Assessment on March 10, 2008, which

---

[10] A GAF score of 61-70 indicates that the individual has "[s]ome mild symptoms ... OR some difficulty in social, occupational, or school functioning...." DSM-IV at 32.

stated that Lane suffered from bipolar disorder, not otherwise specified; cannabis abuse; and a borderline personality disorder. (R. at 988-89.) She noted that Lane reported that she was unable to work. (R. at 988.) Easterling assessed Lane's then-current GAF score at 50. (R. at 988.) Easterling noted that Lane had average or above intelligence, but she was impulsive and engaged in self-sabotaging patterns. (R. at 988-89.)

Another report from this date states that Lane claimed that she was molested by her older sister and two neighbors from the ages of five to seven. (R. at 990.) She also claimed that she was physically abused by her father during her childhood, in that he beat her as a form of discipline. (R. at 990.) Lane reported a long history of depression and anxiety, and she claimed that she had cut her wrists six to seven times, had plans to shoot herself and once tried to smother herself with a pillow. (R. at 990.) She stated that she would go into rages and break things at home. (R. at 990.) She also said that she felt euphoric at times. (R. at 990.) She reported a decrease in appetite, energy and sleep. (R. at 990.) It was noted that Lane exhibited mild delusions and decreased appetite, moderate decrease in energy or fatigue, academic or work inhibition, aggression or rage, anxiety, worrying, distractibility, impaired judgment, poor attention or concentration, pressured speech, racing thoughts, paranoid ideation, recurrent recollection of distressing events, anger, depressed mood, feeling worthless, helplessness, hopelessness, hostility, marked mood shifts and insomnia and severe self-injurious behavior, irritability, low self-esteem, tearfulness and report of abuse or neglect. (R. at 991.) It was noted that Lane had used marijuana daily for more than two years. (R. at

991.) At another point, it was noted that Lane had used marijuana for the previous five years. (R. at 992.)

It also was noted that Lane complained of problems with blindness or serious vision problems, deafness or serious hearing problems, chronic physical problems with her back/spine/limbs and a history of head injuries. (R. at 991.) Lane stated that she would become blind at times with stabbing pain behind her right eye that would last for five minutes. (R. at 992.) She also complained of hearing loss with a ringing in her ears, which prevented her from hearing others talk. (R. at 992.) It was recommended that Lane receive a psychiatric referral and case management services. (R. at 992-93.)

Lane saw Easterling again on March 18, 2008, and reported that she was doing well. (R. at 982.) Lane told her that she was planning to attend a CPR/First Aid course later that night for the volunteer fire department. (R. at 982.) Lane said that she had not smoke marijuana in the past five days and would like to quit. (R. at 982.) Lane said that she enjoyed going out with friends and that she believed that helped her mood. (R. at 982.) She said that she was taking her medication as prescribed with no side effects. (R. at 982.) Easterling noted that Lane was alert and oriented, her thought process was clear and goal-directed, her speech was unremarkable, her mood was euthymic with congruent affect, her interactions were friendly and appropriate, and her hygiene was good. (R. at 982.) She stated that Lane appeared to be stable. (R. at 982.)

Lane saw Easterling again on April 8, 2008, for a routine visit. (R. at 981.) Lane reported taking her medications as prescribed with no side effects, no problems with sleep or appetite, no new symptoms or increase in symptoms and no suicidal or homicidal ideations or auditory or visual hallucinations. (R. at 981.) Lane said that she was smoking marijuana one or two times a week. (R. at 981.) She stated that she had been babysitting her niece and nephew and a little brother who is disabled. (R. at 981.) Easterling noted that Lane was alert and oriented, her mood was euthymic with congruent affect, she made good eye contact, and she was well-groomed. (R. at 981.) She noted that Lane's speech was clear, coherent and goal-directed, and her interactions were friendly and cooperative. (R. at 981.) Easterling stated that Lane appeared psychiatrically stable with no evidence of psychosis. (R. at 981.)

Lane saw Easterling for a routine visit on May 13, 2008. (R. at 980.) Lane stated that she was taking her medication as prescribed with no side effects. (R. at 980.) Lane reported that she was volunteering, and she recently got a new dog, which she took everywhere she went. (R. at 980.) Lane stated that she was smoking marijuana, but only about once a week. (R. at 980.) She reported no problems with sleep or appetite and no new psychiatric symptoms. (R. at 980.) Easterling stated that Lane was alert and oriented, her mood was euthymic, her affect was congruent with mood, she made good eye contact and appeared well-groomed. (R. at 980.) She reported that Lane's interactions were friendly and cooperative. (R. at 980.) Easterling stated that Lane appeared psychiatrically stable with no evidence of psychosis. (R. at 980.)

Lane saw Easterling for routine case management services on June 6, 2008. (R. at 979.) Lane stated that she had been doing fairly well with no new psychiatric symptoms. (R. at 979.) Lane stated that she was taking her medication as prescribed with no side effects. (R. at 979.) She reported no problems with sleep or appetite, although she said that she slept only six to seven hours a night. (R. at 979.) Lane stated that she was smoking about one joint of marijuana a week. (R. at 979.) Lane said that she went out with friends and used her dog for support in an effort to reduce the amount of marijuana she smoked. (R. at 979.) Easterling noted that Lane was oriented, her interactions were friendly and appropriate, her mood was euthymic with congruent affect, and there was no evidence of psychosis. (R. at 979.) She said that Lane appeared to be psychiatrically stable. (R. at 979.)

Lane saw Easterling, again, for counseling on July 24, 2008. (R. at 976.) Lane reported that she had been doing well and had decreased the amount of marijuana she was smoking. (R. at 976.) Lane stated that she had a new boyfriend and was spending time with friends almost every day, which was her main coping skill. (R. at 976.) Lane reported no new psychiatric symptoms, no auditory or visual hallucinations, no suicidal or homicidal ideations and no problems with sleep or appetite, despite missing a few doses of her medication recently. (R. at 976.) Easterling noted that Lane was oriented times four, her interactions were friendly and appropriate, her mood was euthymic with congruent affect, and there were no evidence of psychosis. (R. at 976.) Easterling stated that Lane appeared to be psychiatrically stable. (R. at 976.)

Lane saw Easterling again for counseling on September 11, 2008. (R. at 975.) Lane stated that she was doing fairly well, but recently got into trouble for shoplifting. (R. at 975.) Lane said that she did not know why she did it and that she knew it is wrong. (R. at 975.) Lane stated that she was trying to stay close to home and away from friends who were bad influences on her. (R. at 975.) Lane said that she was doing some volunteer work at Dungannon Elementary School. (R. at 975.) Lane also stated that she was no longer taking her psychiatric medication because it was causing her to feel bad. (R. at 975.) Lane reported some suicidal thoughts, but no plan or intent. (R. at 975.) Lane stated that she continued to smoke marijuana occasionally, but she stated that she did not smoke it as often as she did previously because of a lack of money. (R. at 975.) Lane reported getting eight hours of sleep a night. (R. at 975.) Easterling noted that Lane was oriented, her interactions were friendly and appropriate, her mood was dysthymic with tearful affect, and she showed no evidence of psychosis. (R. at 975.) She stated that Lane appeared to be psychiatrically stable. (R. at 975.)

Lane was seen by Dr. Wisdom-Schepers on September 18, 2008, for treatment for bipolar disorder and cannabis abuse. (R. at 972-73.) Lane stated, "Today I'm fine," but she reported problems with mood swings lasting hours to days. (R. at 972.) Lane stated that she had gotten into trouble for shoplifting again. (R. at 972.) Lane reported that she had tried to get pregnant for years, but had not been successful, though she had been told that there was no medical reason she could not become pregnant. (R. at 972.) Lane stated that she had stopped her psychiatric medication because she felt sedated on it. (R. at 972.) She said that she

was willing to restart the medication at a lower dosage. (R. at 972.) Dr. Wisdom-Schepers noted that Lane was alert, oriented, calm, cooperative and made good eye contact. (R. at 972.) Lane reported her mood as "good today," but it was noted that she appeared mildly constricted. (R. at 972.) Dr. Wisdom-Schepers noted that Lane presented no symptoms of psychosis or gross cognitive impairment. (R. at 972.) Lane denied any suicidal or homicidal ideations. (R. at 972.) Lane was prescribed Lithium and Trazodone. (R. at 972-73.)

Lane saw Easterling for routine case management services on October 14, 2008. (R. at 971.) On this date, Lane reported that she had been doing well. (R. at 971.) She stated that she had not smoked marijuana in two weeks due to not having any, but she also said that she no longer wished to use it. (R. at 971.) Lane reported that she was scheduled to appear in court on November 20, 2008, on shoplifting charges. (R. at 971.) Lane reported no new psychiatric symptoms and no suicidal or homicidal ideations. (R. at 971.) Lane stated that she was taking her medications as prescribed with no side effects. (R. at 971.) She reported no auditory or visual hallucinations and no problems with sleep or appetite. (R. at 971.) Easterling noted that Lane was oriented, her interaction was friendly and appropriate, her mood was euthymic with congruent affect, and there was no evidence of psychosis. (R. at 971.) She stated that Lane appeared to be psychiatrically stable. (R. at 971.)

Lane presented to the Johnson City Medical Center Emergency Department on March 18, 2009, and stated "I will kill myself before I go to jail." (R. at 1031-32.) The attending physician noted that Lane gave a history of depression, was

tearful and said that she had "violated probation" and she did not "want to go to court tomorrow." (R. at 1031, 1073.) The physician noted that Lane's consciousness, orientation, attention, memory, mood, affect, appearance, speech, judgment, abstractions, general information, though content, insight, spatial perceptions and neurological examination all were normal. (R. at 1031-32.) The physician diagnosed anxiety and depression with suicidal ideations. (R. at 1032.) Lane saw a crisis mental health worker and was later discharged. (R. at 1078.)

The crisis mental health worker's notes from March 18, 2009, state that Lane did not meet the criteria for either involuntary commitment or voluntary psychiatric hospitalization. (R. at 1176, 1177.) The health worker's notes state that Lane exhibited good attention/concentration and was alert and oriented, cooperative with appropriate affect exhibited no evidence of agitation and made good eye contact. (R. at 1175.) Lane said that she was "stressed out." (R. at 1175.) While she denied experiencing any hallucinations on that day, Lane stated that she sometimes would hear indistinguishable voices. (R. at 1175.) The worker stated that Lane's judgment, impulse control and insight were all fair. (R. at 1175.) She placed Lane's then-current GAF score at 45.

On July 16, 2009, Lane sought treatment at the Emergency Department at Indian Path for left knee pain. (R. at 1066-67.) An x-ray of her left knee showed joint space narrowing at the medial compartment of the knee with mild osteophyte formation in all compartments compatible with mild osteoarthritis, particularly involving the medial compartment. (R. at 1068.) On November 6, 2009, Lane

sought treatment at the Emergency Department at Indian Path for left knee pain. (R. at 1059-60.) An x-ray of her left knee showed some mild narrowing of the medial joint space consistent with osteoarthritis, which was unchanged from July 16, 2009. (R. at 1061.)

On November 25, 2009, Lane underwent surgery for a left knee medial meniscus tear with partial anterior cruciate ligament, ("ACL"), involvement of anterior fibers and degenerative joint disease of the medial femoral condyle. (R. at 622-24, 712-14.) Lane sought treatment at the Emergency Department at Holston Valley Medical Center, ("Holston Valley"), on November 30, 2009, for complaints of pain in her left knee after surgery. (R. at 465-66.) X-rays taken of Lane's left knee showed osteoarthritis, but no acute abnormality. (R. at 467.) A follow-up examination on December 8, 2009, with Dr. Eric W. Carson, M.D., showed some mild swelling with no erythema or drainage. (R. at 616.) Dr. Carson removed Lane's sutures. (R. at 616.) Dr. Carson noted that Lane had been ambulating without difficulty and that her pain was "well-controlled." (R. at 616.) Dr. Carson advised Lane to continue to be weight bearing as tolerated, and he ordered physical therapy to work on quad strengthening. (R. at 616.) He prescribed Vicodin and ordered a follow-up examination in four weeks. (R. at 616.) A follow-up examination on March 1, 2010, with Dr. Carson showed no swelling, erythema, drainage or sign of infection. (R. at 610.) Lane had good range of motion in her knee with no joint line tenderness. (R. at 610.) Dr. Carson noted that Lane had not attended physical therapy as recommended and had "no interest in doing so." (R. at 610.) Dr. Carson gave Lane an injection in her left knee. (R. at 610.)

Lane sought treatment at the Emergency Department at Mountain View Regional Medical Center, ("Mountain View"), on January 13, 2010, for mild lower back, left knee and right hip pain due to a fall. (R. at 763-65.) Lane was given Lortab and Flexeril, her knee was wrapped in an Ace bandage, and she was discharged. (R. at 765.) She returned on February 4, 2010, for an injury to her left knee when she fell. (R. at 756, 762.) She was diagnosed with a knee contusion, given Motrin and released. (R. at 757, 762.) Lane returned to the Emergency Department at Mountain View for right-sided lower back pain on July 25, 2010. (R. at 754-55.) Lane also was treated and released again on October 8, 2010, for injuries she sustained in a motor vehicle accident. (R. at 750-53, 369-73.) X-rays of her left ankle showed some soft tissue swelling. (R. at 752.) Lane was diagnosed with a contusion/sprain of her ankle. (R. at 371.)

In April 2010, Lane had Chiari malformation decompression surgery with C1 partial laminectomy. (R. at 584-85, 591-92.) On April 9, 2010, Lane presented to the Emergency Department at Indian Path with complaints of a "vortex" headache with pain of a 10 on a 10-point scale. (R. at 1051-55.) Lane gave a history of brain surgery on the previous Friday. (R. at 1054.) On this hospital note, it states that Lane admitted to illicit drug use. (R. at 1051.) At another point, the records show that Lane stated that she smoked a marijuana "joint" daily. (R. at 1054.) On April 16, 2010, Lane presented to the Emergency Department at Indian Path, complaining of a throbbing headache and vomiting since her recent surgery. (R. at 1047.) Lane reported that she came to Indian Path because her surgeon would not call her in any pain medication. (R. at 1048.) The physician

recommended that Lane return to see her surgeon and diagnosed her with chronic headache. (R. at 1048.)

Lane returned and was hospitalized at UVA Health Systems from April 17-19, 2010, for complaints of headache with persistent nausea and vomiting post-surgery. (R. at 538, 542-43, 660-72, 1185-86, 1188-1203.) On May 16, 2010, Dr. John A. Jane, Sr., M.D., Ph.D., with the UVA Health Systems Department of Neurological Surgery, reviewed x-rays of Lane's spine and stated that Lane had "some mild thoracic degenerative changes," which could account for her mid-thoracic pain. (R. at 564.) He recommended physical therapy. (R. at 564.) A May 19, 2010, letter from Dr. Jane stated that he had seen Lane for neurosurgical follow up and that she had "not gotten quite as good as she would like to be," although Dr. Jane noted that her headaches were "certainly much improved." (R. at 574.) A follow-up MRI of Lane's brain and cervical and thoracic spine, taken on June 11, 2010, showed post-surgical changes in her brain with no evidence of disc protrusion, spinal stenosis or cord compression in her cervical or thoracic spine. (R. at 353-55.) The study did show mild, multilevel degenerative disc disease in the thoracic spine. (R. at 354.)

Lane was examined by Dr. Kelly C. Gwathmey, M.D., a neurology resident at UVA Health Systems, on July 11, 2010, (R. at 392-95.) Lane told Dr. Gwathmey that she had suffered from headaches most of her life. (R. at 393.) She described her headaches as sharp, shooting pain behind her right eye, and she said that she averaged three headaches a week. (R. at 393.) She complained of her

vision "going black" on occasion with headaches, but she denied seeing an aura with headaches. (R. at 393.) Lane admitted that she drank four to five caffeinated sodas a day and that she smoked marijuana daily. (R. at 393-94.) Dr. Gwathmey diagnosed Lane as suffering from migraine headaches. (R. at 394.) He advised that she decrease her caffeine consumption. (R. at 394.)

Lane was treated at Clinch River for a number of ailments from July 2008 to April 2013. Lane was seen by Dr. Nazia I. Shehzad, M.D., on July 7, 2008, for problems with her left knee. (R. at 1010-11.)  Lane said that she had experienced problems with her knee for years after injuring it in a motor vehicle accident. (R. at 1010.) Lane said that, when she would bend her knee or sit, it would often swell up and hurt. (R. at 1010.) She said her right knee hurt her, too. (R. at 1010.) Lane claimed that bad knees "run in family," but Dr. Shehzad noted that Lane was 5 feet, 4.5 inches tall and weighed 274 pounds. (R. at 1010.) Lane also told Dr. Shehzad that "sometimes something pops in her belly and at times at different parts of her body, feels like pain but not sure, goes away on [itself] and not sure [what] it is." (R. at 1010.)

Lane stated that she had been psychiatrically hospitalized in February 2008 for a suicide attempt and that she was in mental health treatment. (R. at 1010.) She complained of anxiety and stressors, but denied any suicidal ideations. (R. at 1010.) Oddly, Lane denied any drug use. (R. at 1010.) Dr. Shehzad noted that Lane was morbidly obese, alert, oriented and pleasant. (R. at 1010.) Dr. Shehzad stated that her exam of Lane's right knee was normal other than for positive McMurray

sign and moderate cracking and grinding when flexed. (R. at 1010.) Her report makes no mention of any findings with regard to Lane's left knee. (R. at 1010-11.) Dr. Shehzad said that she would review a recent MRI of Lane's left knee, and she recommended that she lose weight and use ibuprofen. (R. at 1011.)

Lane saw Dr. Gary E. Michael, M.D., on July 21, 2008, for continued complaints of knee pain, worse when standing. (R. at 1171.) Dr. Michael found no swelling or redness in Lane's left knee, with full range of motion with pain and tenderness in the medial-posterior jointline. (R. at 1171.) Dr. Michael noted that an MRI showed a meniscus tear, and he prescribed Celebrex and a Toradol injection. (R. at 1171.) Dr. Michael said he would refer Lane to the Department of Orthopedic Surgery at UVA. (R. at 1171.) When Lane returned to see Dr. Todd A Cassel, M.D., on August 22, 2008, for treatment of bronchitis, her weight was up to 256.5 pounds. (R. at 1009.)

Lane saw Dr. Michael on October 8, 2008, complaining of constant neck pain and pressure without radiation. (R. at 1165.) Lane also complained of back pain without radiation, tingling or numbness. (R. at 1165.) Dr. Michael found no tenderness in Lane's vertebral spine, in her neck or upper back or in her ribs. (R. at 1165.) He found paraspinal spasm present on the left side of her neck, limited neck range of motion in all directions, trapezius tenderness on the left side, normal range of motion of the shoulder joint, normal motor strength, tender rhomboid muscle, paraspinal tenderness, negative straight leg raising tests bilaterally, normal motor system bilaterally in her lower extremities and an unremarkable gait. (R. at 1165.)

Dr. Michael advised Lane to start exercises for her neck problems and to call her mental health case worker. (R. 1166.)

Lane returned to see Sabrina F. Mitchell, F.N.P., a family nurse practitioner, on October 17, 2008, complaining of pain and pressure in the back of her head. (R. at 1162.) Lane said her head hurt constantly, and it made her dizzy. (R. at 1162.) Lane said she also had felt weak for years, with tingling and numbness in her left arm since 2000. (R. at 1162.) Lane denied any vision changes. (R. at 1162.) She complained of short-term memory problems. (R. at 1162.) Lane also stated that she had an attorney who was helping her seek disability benefits. (R. at 1162.)

Mitchell reviewed previous MRI imaging of Lane's brain and noted that it showed a Chiari I malformation of the posterior fossa with no evidence of secondary hydrocephalus. (R. at 1163.) Mitchell noted that a "Chiari I malformation is thought to be related to fetal development with a downward displacement of more than 4mm of the cerebellar tonsils beneath the foramen magnum into the cervical spine canal. …[S]ymptoms can include head and neck pain with occipital headaches, vision changes, and photophobia which the patient reports has occurred since before 2000 when the malformation was discovered." (R. at 1163.) Mitchell started Lane on muscle relaxers -- Baclofen of the day and Flexeril at night. (R. at 1163.)

Lane saw Dr. Michael on November 19, 2008, and told him that she had stopped taking her psychiatric medication. (R. at 1160.) She claimed she stopped

taking Lithium because it was making her feel nauseated. (R. at 1160.) Lane described her mood off of her medication as "more bitchy," agitated and irritated by anyone making noise. (R. at 1160.) Lane stated that she was not hyper, but she was experiencing more trouble falling and staying asleep. (R. at 1160.) Dr. Michael prescribed Seroquel for Lane's bipolar disorder. (R. at 1160.) Lane saw Dr. Shehzad again on November 20, 2008, and her weight was listed as 264 pounds. (R. at 1007.)

Lane saw Mitchell on February 27, 2009, complaining of back and neck pain with headaches in the back of her head. (R. at 1151.) Lane also complained of tingling and numbness in her hands and, sometimes in her feet, and limited range of motion due to pain. (R. at 1151.) Lane denied any radiation of her pain or bowel or bladder incontinence. (R. at 1151.) Lane said that she had been in nine motor vehicle accidents and had experienced back pain for the previous eight years. (R. at 1151.) Lane claimed that she experienced sharp stabbing pain that came and went with a constant ache. (R. at 1151.) Mitchell noted vertebra tenderness with palpation at the C5 through C7, T8 through L1 and L3 through sacral vertebra levels. (R. at 1152.) Mitchell noted lumbar muscular tenderness and tightness, with no rhomboid tenderness, with bilateral sternocleidomastoid and trapazius tenderness, negative straight leg raising tests bilaterally and a normal gait. (R. at 1152.) Mitchell prescribed Naprosyn and Baclofen and recommended Lane continue taking Flexeril at bedtime. (R. at 1152.) February 28, 2009, x-rays of Lane's spine showed mild degenerative changes in her lower thoracic spine with no acute abnormality. (R. at 1273-74.)

On March 11, 2009, Lane told Mitchell that she had pain the night before that felt like someone was stabbing her in her right side, then the pain went to her foot. (R. at 1148.) Lane said that it felt like electricity ran down to her right foot. (R. at 1148.) She said the pain occurred while she was sitting in a vehicle and that it lasted for a few minutes and then was gone. (R. at 1148.) She complained of limited range of motion secondary to pain, but she denied any radiation of pain, trauma or injury or any tingling or numbness. (R. at 1148.) Lane stated that she had suffered from headaches since age 12 after she was thrown from a horse, hit her head and blacked out. (R. at 1148.) Lane complained of two additional head injuries in motor vehicle accidents. (R. at 1148.) Lane stated that she experienced spells where everything would go black, but she could still hear what was going on around her. (R. at 1148.) She stated that this had been getting worse over the previous few months. (R. at 1148.) Mitchell noted no vertebra tenderness upon palpation, mild lumbar muscular tightness without tenderness and mild rhomboid muscular tightness, extending from the trapezius and sternocleidomastoid muscles with no tenderness. (R. at 1149.)

Lane was seen by Karen Odle, L.P.C., a licensed professional counselor, from December 10, 2008, to March 15, 2010. (R. at 945-48.) On December 10, 2008, Lane saw Odle for individual therapy, during which they discussed Lane's shoplifting behavior. (R. at 948.) Lane complained of mild depression, mild anxiety, mild insomnia, moderate irritability/anger, mild crying spells and no suicidal or homicidal ideations. (R. at 948.) Odle noted that, based on her mental status examination, Lane's mood was depressed and irritable, and she was not

suffering from any paranoia or delusions. (R. at 948.) Odle noted that Lane's judgment/insight was fair. (R. at 948.) Lane saw Odle again on January 20, 2009, on which date Odle noted that Lane's participation in individual therapy was "problematic." (R. at 947.) Odle noted that Lane was angry and irritable toward her, which made it difficult to discuss her current mood. (R. at 947.) On this occasion, Lane complained only of moderate to severe irritability/anger. (R. at 947.) Odle's impression of Lane's mental status examination was the same as the previous month, except that Odle noted that Lane experienced "transient" paranoia. (R. at 947.)

Lane told Mitchell on January 6, 2010, that she had fallen coming down a set of steps and hurt her left knee and back. (R. at 1136.) She stated that she had immediate pain in the center of the mid- to lower back and to the left side of her back. (R. at 1136.) Lane said her left knee was sore and throbbing. (R. at 1136.) Lane said that she had arthroscopic surgery on her left knee the previous November and had been able to walk and run on it since then. (R. at 1136.) Lane stated that she had been able to walk and bear weight on her knee since the fall, but since the surgery, she had experienced a shooting sensation when she walked. (R. at 1136.)

On January 28, 2010, Lane saw family nurse practitioner Donna Sparks for complaints of pain in hips and knees. (R. at 1134.) Lane said that her right lateral knee hurt when walking. (R. at 1134.) Lane denied any trauma or injury or any swelling, redness, warmth or locking. (R. at 1134.) Lane also denied knee

buckling/giving out, tingling and numbness or lower back pain. (R. at 1134.) Sparks noted no tenderness, swelling, redness or warmth in Lane's knee. (R. at 1134.) Sparks gave Lane a steroid shot in her knee. (R. at 1134.)

On February 17, 2010, Lane told Dr. Michael that she had discontinued use of all of her psychiatric medications because they "made her feel funny." (R. at 1132.) Lane complained that she did not want to continue counseling with "anyone from around here." (R. at 1132.) Lane complained of stressors, including not having a job. (R. at 1132.) She also complained of panic attacks, mostly at night, even when she was taking Seroquel. (R. at 1132.) Lane also complained of diffuse muscle aches, tender to the touch in her upper and lower extremities, which were severe at times. (R. at 1132.) Dr. Michael noted that Lane had normal range of motion in her spine. (R. at 1132.) Lane saw nurse practitioner Mitchell on March 3, 2010, and Mitchell noted that an examination of Lane's neck showed it was nontender with full range of motion. (R. at 1130.) Mitchell also noted that Lane had full range of motion in her back without pain. (R. at 1130.) Mitchell noted that Lane's gait was normal and that she had normal strength bilaterally with no edema in her extremities. (R. at 1130.)

On March 5, 2010, Lane complained to Odle of mild depression, mild anxiety, mild insomnia, variable appetite, a mild decrease in energy and attention and concentration, moderate irritability/anger, moderate crying spells, two to three times a week, mild panic attacks, two to three times a month, and no suicidal or homicidal ideations. (R. at 946.) Odle noted that Lane's affect was euthymic, her

orientation and thought process were intact, she was not experiencing paranoia or delusions, and her judgment/insight was fair. (R. at 946.) Odle stated that Lane requested that Odle complete "mental" papers for Lane's disability claim. (R. at 946.) Odle noted that since Lane had not been to therapy in more than a year, she advised Lane that she could not complete the form that day. (R. at 946.) She stated that she could mail them to her after her appointment. (R. at 946.) On March 15, 2010, Lane complained of mild depression, moderate anxiety, moderate irritability/anger, mild crying spells and no suicidal or homicidal ideations. (R. at 945.) Odle described Lane's mood as irritable with intact orientation and thought process. (R. at 945.) She stated that Lane was not experiencing any paranoia or delusions and that her judgment/insight was fair. (R. at 945.) Odle noted that they discussed Lane's upcoming surgery and Lane's problems connection and feeling comfortable with a counselor. (R. at 945.)

Lane saw Mitchell on April 13, 2010, for removal of her surgical stitches. (R. at 1123.) Lane stated that she had not suffered from a headache since her surgery on April 2. (R. at 11.23.) On May 4, 2010, Lane told Mitchell that she was no longer having any headaches in the back of her head. (R. at 1121.) Lane reported to Mitchell, on May 18, 2010, that she had not suffered from any episodes of bad headaches since her last hospitalization at UVA. (R. at 1119.) Lane stated that she did experience some muscle spasms if she overexerted herself. (R. at 1119.)

Lane saw Dr. Shehzad on August 17, 2010, for complaints of left knee pain

and requested a steroid injection in the knee. (R. at 958.) She told Dr. Shehzad that she had severe arthritis in her knee. (R. at 958.) Lane denied any illicit drug use, although she had told Dr. Gwathmey the previous month that she smoked marijuana daily. (R. at 958.) Dr. Shehzad noted that Lane was 5 feet, 4 inches tall and weighed 235 pounds. (R. at 958.) He stated that both knees were positive for crepitus. (R. at 958.) Dr. Shehzad diagnosed Lane with unspecified left knee pain and low back pain, although his note makes no mention of Lane complaining of low back pain. (R. at 958.) Lane was given a steroid shot in her left knee. (R. at 959.)

Lane saw Dr. Michael on August 23, 2010, for complaints of hurting all over and feeling weak. (R. at 956-57.) Lane stated that both arms hurt when she lifted anything. (R. at 956.) She also complained that her right leg hurt the previous week from the outside down the leg. (R. at 956.) Dr. Michael noted that Lane was 5 feet, 4 inches tall and weighed 240 pounds. (R. at 956.) Dr. Michael diagnosed fatigue and malaise and ordered blood tests. (R. at 956-57.)

On October 11, 2010, Lane saw Dr. Michael with complaints of a sprained left ankle and pulled muscles in her right leg above her knee, whiplash and muscle spasms in her back after being hit by a car recently. (R. at 952-53.) Lane claimed that a motorist rammed his car into the back of hers and that, when she got out of her car, the motorist attempted to run over her. (R. at 952.) Dr. Michael noted that Lane's lower back examination showed normal rotation with slightly tight lumbar muscles. (R. at 952.) Straight leg raising tests were negative bilaterally. (R. at 952.)

He noted that Lane's gait was unremarkable and that she was able to bend over and pull her left pant leg up to show him where her ankle hurt. (R. at 952.) Dr. Michael noted some mild swelling in her ankle with full range of motion with minimal pain. (R. at 952.)

Lane was seen by Mitchell on February 15, 2011, for a pregnancy test, complaints of sinus drainage and cough and a cortisone shot in her left knee. (R. at 899-901.) Lane complained of limited range of motion and pain in her left knee with buckling. (R. at 899.) She also complained of intermittent lower back pain. (R. at 899.) Mitchell noted crepitus and tenderness in the medial and lateral patella of Lane's left knee with no swelling, redness or warmth. (R. at 900.) Mitchell also noted vertebra tenderness in Lane's lower back at the L4 to L5 level with bilateral lumbar muscular tenderness and tightness. (R. at 900.) Straight leg raise testing was normal. (R. at 900.) Mitchell prescribed naproxen and Flexeril. (R. at 901.) Lane saw Dr. Michael on April 30, 2012, for complaints of left knee pain. (R. at 878.) Dr. Michael gave Lane a steroid shot in her knee. (R. at 878.)

On June 11, 2012, Lane saw Mitchell for complaints of chest pain on the left side with shortness of breath. (R. at 873-76.) Lane described the pain as throbbing that lasted from a few seconds to a couple of minutes. (R. at 873.) Lane also complained of palpitations, dizziness and fatigue. (R. at 873.) Lane was diagnosed with unspecified chest pain and costochondritis. (R. at 874.) Lane saw Dr. Michael on June 18, 2012, to get him to complete a form for her disability claims. (R. at 871-72.)

Dan Levesque, D.C., a chiropractor, prepared a Report of Medical Evaluation on February 21, 2011, based on his initial examination, evaluation and subsequent treatment of Lane on four occasions. (R. at 933-43.) According to Levesque, Lane reported lifelong joint and back problems. (R. at 933.) Lane complained of severe, chronic neck, mid-back and low back pain and leg pain, weakness, numbness and tingling. (R. at 933.) Lane also complained of frequent weakness and pain in her shoulders and arms, numbness, tingling and swelling, as well as weakness of her grip in both hands, frequent headaches, chronic fatigue, insomnia, fibromyalgia, frequent joint pain and swelling, weakness and pain in both knees, depression and anxiety. (R. at 933.)

In particular, Lane complained of a constant, dull, aching pain in her lower back across her beltline with frequent sharp, cutting, shooting pain, radiating into the right side of her pelvis, hip and leg. (R. at 933.) Lane said that she suffered this pain between three-quarters and all of her time awake. (R. at 933.) She claimed the pain precluded her from carrying out activities of daily living. (R. at 933.) She rated her back and leg pain as a nine on a 10-point scale, and she said that her back pain limited her from sitting, standing or lying in the same position for longer than 15-20 minutes at a time and repetitive bending and lifting of objects weighing more than five to 10 pounds. (R. at 933.) Lane also complained of a constant, dull, aching and burning pain in her neck with frequent sharp, shooting pain in her neck that radiated into her arms and across the tops of her shoulders. (R. at 933.) She complained of decreased range of motion in her neck and of knots and spasms in her neck and trapezius muscles. (R. at 933.) Lane said that she suffered from neck

pain that she ranked a seven to eight on a 10-point scale three-quarters to all of her time awake that precluded her from carrying out activities of daily living. (R. at 933.)

Lane also complained of dull, aching, burning and stinging pain in her mid-back that radiated into her shoulder blades and through to her sternum, causing a type of chest pain and shortness of breath. (R. at 934.) She said that she suffered this pain on a level of five to six on a 10-point scale three-quarters to all of her time awake, and it caused serious diminution in her capacity to carry out daily activities. (R. at 934.) Lane said that this pain was aggravated by prolonged standing, sitting and lifting and limited her ability to push, pull or work with her arms outstretched or overhead for any length of time. (R. at 934.) Lane further complained of frequent, dull, aching, burning pain in her hips and legs, from three-fourths to all of her time awake, and traveling down to her toes with weakness, numbness and tingling in her legs and swelling and frequent cramps in her legs. (R. at 934.) She said that her leg pain was nearly constant and severely limited her from standing or walking longer than 20 minutes at a time or standing still longer than 10-15 minutes. (R. at 934.) She also complained of throbbing, dull, achy, sometimes sharp, unstable bilateral knee pain with frequent swelling at the end of the day or if she spent more than a few hours on her feet. (R. at 934.) Lane complained of extreme stiffness in her knees with trouble bending them, resulting in serious diminution in her capacity to carry out daily activities. (R. at 934.) She claimed that she could not kneel, squat, crouch or climb. (R. at 934.) She said that her knees were very unstable at times, especially after she had been on them for

more than a few hours at a time. (R. at 934.)

Lane also said that she suffered from a dull, aching pain, numbness and tingling in both hands with weakness of grip that hindered her ability to perform fine motor functions with her fingers, such as typing or writing. (R. at 934.) She also complained of frequent stiffness and swelling in her hands. (R. at 934.) Lane claimed that she experienced these symptoms three-fourths to all of her time awake and that they prevented her from carrying out activities of daily living. (R. at 934.) Lane also complained of a sharp, burning and stinging pain in her arms and shoulders with weakness in her arms and an inability to work with her arms outstretched in front of her or overhead for more than a few minutes. (R. at 935.) She claimed that these symptoms occurred three-fourths to all of the time and prevented her from carrying out activities of daily living. (R. at 935.)

Lane also complained of symptoms, which Levesque said were characteristic of fibromyalgia, including chronic fatigue and unpredictable high levels of pain in her joints and muscles, which moved around her body. (R. at 935.) She also complained of frequent, throbbing temporal and suboccipital headaches, which occurred three to five times a week, and could last up to several days, completely debilitating her by causing her to frequently vomit. (R. at 935.) Lane stated that a previous surgery to correct a congenital defect had not helped her headaches. (R. at 935.) Lane said that she had headaches three-fourths to all her time awake and that the headaches caused serious diminution in her capacity to carry out daily activities. (R. at 935.) Lane rated her headaches at a nine on a 10-

point scale, and she stated that her headaches greatly affected her ability to concentrate/focus on a particular task, pay attention or perform any physical task whatsoever. (R. at 935.)

Levesque stated that Lane had "several herniated discs and pinched nerves in her spine" with "advanced levels of degenerative disc disease." (R. at 936.) Levesque noted that Lane was 5 feet, 6 inches tall and weighed 220 pounds. (R. at 938.) Levesque stated that, upon initial presentation, Lane was in "obvious visual physical distress and extreme pain." (R. at 938.) He noted that she walked slightly antalgic upon first rising from a seated position with short, guarded steps and an overall unsteady gait.  (R. at 938.) Levesque said that Lane sat for only 15-20 minutes before she had to get up and move about the room because of her low back/leg pain. (R. at 938.)

Levesque's examination showed that Lane had a limited range of motion in her cervical spine with "moderate restriction" in her flexion, extension, left lateral flexion, right lateral flexion and left rotation and "marked restriction" in her right rotation. (R. at 938-39.)  Levesque stated that Lane had "marked restriction" in her true lumbar flexion and "mild restriction" in her left and right lateral flexion of her lumbar spine. (R. at 939.) Levesque also stated that his grip strength evaluation showed that Lane had a 27.29 percent strength loss index in her right hand and a 56.8 percent strength loss index in her left hand. (R. at 939.)

Levesque stated that x-rays taken of Lane's spine showed mild to moderate

spondylosis was present with mild to moderate degenerative arthritis at several disc levels. (R. at 942.) Levesque stated that the x-rays showed mild intervertebral disc space narrowing at the C7/T1 and C4/5 levels and mild to moderate disc space narrowing at the L5/S1 level. (R. at 942.) Levesque diagnosed Lane with herniated discs at the L5, T6, C7 and C1/2 levels resulting in cervical and lumbar neuritis/radiculitis, that was most likely causing her arm and leg pain, weakness and numbness, osteoarthritis of the spine, degenerative disc disease, carpal tunnel syndrome, chronic fatigue, insomnia, fibromyalgia, chronic pain and arthritis. (R. at 942.) Levesque stated that Lane's prognosis was poor. (R. at 942.) He stated that Lane had "permanent and progressively accelerating disc damage in her spine." (R. at 942.) Levesque said that Lane's spinal condition would not allow her to stand or walk for more than 15-20 minutes because of extreme low back and leg pain. (R. at 942.) He also said that she could not sit longer than 20-30 minutes without "writhing in pain/shifting" and having to stand and walk some because of her low back, hip and leg pain. (R. at 942.) He said that weakness and pain in her hands and arms would limit her from doing any fine motor skills such as typing or writing. (R. at 942.) He stated that Lane's grip strength "disability" would severely limit her from activities such as grasping, pinching, holding or carrying anything more than five to 10 pounds. (R. at 942.) Levesque stated, "I have treated her over a short period of time and concluded there is little I can do for her other than the possibility of temporary pain relief, however she has not responded to any of my treatments as of yet. It is my professional opinion that … Lane has lost the ability to provide for herself or her family financially or otherwise and should qualify for total disability assistance as soon as possible." (R. at 942-43.)

Lane presented to the emergency department at UVA Health Systems on February 16, 2011, for complaints of headache and was seen by Dr. Scott Syverud, M.D. (R. at 378-92.) Lane complained of "hurting all over [her] body." (R. at 378.) Lane said that her headache symptoms had worsened since being rear-ended in a motor vehicle accident and being "beat up" by three females in October 2010. (R. at 378.) Dr. Syverud noted that Lane did not appear to be in any acute distress, but, instead, appeared comfortable. (R. at 380.) Neurological examination was normal except for Lane's complaint of tingling in her right lower extremity from knee down to toes. (R. at 380.) Dr. Syverud requested a neurological consult. (R. at 381.) A head CT scan performed on February 16, 2011, showed post-surgical changes, but no acute intracranial abnormality. (R. at 399.)

Lane was seen by Dr. Michael Brogan, M.D., a neurology resident at UVA Health Systems, for consultation after her presentation to the UVA Health Systems Emergency Department on February 16, 2011, with complaints of worsening chronic headaches. (R. at 389-92, 656-59.) Lane gave a history of suffering from headaches starting at age 10. (R. at 389, 656.) She described these headaches as being primarily sharp, shooting pains behind her right eye. (R. at 389, 656.) She said that she suffered from these headaches an average of three times a week and that the headaches lasted from 15 minutes to an entire day. (R. at 389, 656.) Lane said that her headaches were aggravated by sunlight and were relieved by lying down and putting a washcloth on her head. (R. at 389, 656.) She also said that her headaches were associated with whole body aches and, occasionally, a sharp pain down her spine. (R. at 389, 656.) She also reported that she was nauseated and

vomited on occasion with these headaches. (R. at 389, 656.)

Dr. Brogan noted that Lane had been seen previously for complaints of headaches in July 2010, but she had failed to keep her follow-up appointments. (R. at 389, 656.) Dr. Brogan noted that when Lane was seen originally, it was thought that her exam and history were consistent with migraine headaches. (R. at 389, 656.) He noted that Lane had been started on Seroquel and Abilify for the "mood issues" and that she was taking Flexeril for neck pain and spasm. (R. at 389, 657.) Lane also admitted to taking her mother's Lortab once or twice a month for bad headaches. (R. at 390, 657.) Lane reported that she was involved in a motor vehicle accident on October 10, 2010, when the car she was driving was struck from behind. (R. at 389, 657.) She stated that, after exiting her car, she was struck by another vehicle. (R. at 389, 657.) She also said that she was assaulted by three women on October 31, 2010. (R. at 389, 657.) Lane reported that she also experienced a circumferential numbness from mid-forearm down, bilaterally, as well as mid-calf down on her legs. (R. at 389, 657.) Lane reported that she smoked a pack of cigarettes a day, along with smoking marijuana daily. (R. at 390, 658.) She stated that she drank three to five caffeinated beverages a day. (R. at 390, 658.) She said that she was applying for disability benefits. (R. at 390, 658.)

Lane complained of fatigue and generalized aches, but she denied any blurry vision. (R. at 390, 658.) She complained of occasional tinnitus. (R. at 390, 658.) Dr. Brogan noted that Lane did not appear to be in any acute distress. (R. at 391, 658.) Lane's back had some mild tenderness on palpation in the cervical

paraspinous muscles. (R. at 391, 658.) Lane's neurological examination was unremarkable, and it showed that she had normal muscle tone, bulk and strength and normal reflexes throughout her body. (R. at 391, 658.)

Lane's headache symptoms went from an eight on a 10-point scale to a two with administration of Compazine and Benadryl, so Dr. Brogan recommended that she be given prescriptions for these medications, as well as Lamictal. (R. at 390-91, 657, 659.)

Lane was seen by staff members at Clinch River from May 13-18, 2011, for complaints of persistent vomiting. (R. at 419-23.) A urine drug screen performed on Lane on May 12, 2011, was positive for the use of marijuana. (R. at 460.) An abdominal ultrasound performed on Lane on May 17, 2011, was normal. (R. at 457.) A test performed on May 18, 2011, determined that Lane was pregnant. (R. at 423.) On July 27, 2011, Dr. Shehzad gave Lane a cortisone shot in the left knee for complaints of pain. (R. at 427.)

The medical records show that Lane delivered a child by Cesarean section, ("C-section"), on January 18, 2012. (R. at 293-94.) Lane was seen at the Holston Valley Emergency Department on January 31, 2012, for complications with her incision. (R. at 839-40.)

Lane saw Dr. Brogan on April 5, 2012, for follow up of complaints of migraine headaches. (R. at 647.) Lane gave a history of chronic headaches,

consistent with migraine without aura, according to Dr. Brogan. (R. at 647.) Dr. Brogan stated that Lane's headaches were complicated by caffeine, tobacco and marijuana use, poor sleep and anxiety. (R. at 647.) Dr. Brogan noted that Lane's symptoms were greatly improved with administration of Compazine and Benadryl previously, and he had recommended a prescription for oral Compazine and Benadryl to be taken every six hours as needed for migraine headaches. (R. at 647.) He also had recommended Lane use Lamictal to prevent migraine headaches. (R. at 647.) Lane said that she had received these medications, but had stopped all medication when she became pregnant. (R. at 648.) Lane stated that her headaches were a little better during pregnancy, but not dramatically. (R. at 648.) Lane said that she continued to suffer three to five headaches a week, with each headache lasting from a couple of hours up to two days. (R. at 648.)

Lane complained of some recent spells of transient visual loss, affecting both eyes at the same time. (R. at 648.) She reported that things went completely black suddenly. (R. at 648.) She said this sometimes was associated with her headaches and sometimes not, and that sometimes it was associated with lightheadedness or dizziness, but not consistently. (R. at 648.) Lane stated that this blindness sometimes was precipitated by a stabbing pain in her left eye. (R. at 648.) She claimed that she did not lose consciousness with these spells, although she did report falling once. (R. at 648.)

Dr. Brogan recommended Lane again take Compazine, Benadryl and sumatriptan for her headaches. (R. at 649.) He also recommended that she begin

taking amitriptyline to prevent her headaches. (R. at 648.) Dr. Brogan stated that he believed that Lane's complaints of transient blindness were "a dramatic form of migrainous visual aura though the time course is a little brief and the relationship to her headache is tenuous." (R. at 649.) He also ordered an MRI of her brain and cervical spine, and he recommended that Lane be seen again in three months. (R. at 649.)

Lane also was seen on April 5, 2012, by Dr. John A. Scanelli, M.D., an orthopedic surgery resident at UVA Health Systems, for knee complaints. (R. at 650.) Dr. Scanelli noted that Lane recently had a baby and had gained a lot of weight, and she stated that her knees were bothering her more now. (R. at 650.) Otherwise, she stated that she had no repeat mechanical symptoms. (R. at 650.) Dr. Scanelli's examination revealed no swelling, erythema, drainage or sign of infection with good range of motion and positive medial joint line tenderness. (R. at 650.) Dr. Scanelli reviewed bilateral knee x-rays, which showed moderate left and mild right knee medial compartment joint space narrowing with mild bilateral lateral patella subluxation. (R. at 650.) Dr. Scanelli diagnosed left knee medial femoral condyle degenerative disc disease status-post partial medial menisectomy. (R. at 650.) Dr. Scanelli ordered physical therapy and prescribed naproxen and Mobic. (R. at 650.)

Lane was seen at the Emergency Department at Indian Path on May 7, 2011, for complaints of vomiting. (R. at 431-33.) A urine screen performed on May 7, 2011, showed that Lane tested positive for the use of marijuana. (R. at 434.) An

abdominal CT scan performed that day on Lane did not show anything abnormal. (R. at 437.) Lane returned to Holston Valley and was admitted overnight on May 9-10, 2011, for complaints of nausea, vomiting and abdominal pain. (R. at 438-39, 469-73.) Lane was diagnosed with asymptomatic intermittent bradycardia and a urinary tract infection. (R. at 438, 469.) Lane was given prescriptions for Phenergan and Cipro upon discharge. (R. at 439, 470.)

Lane was seen at the Emergency Department of Holston Valley the next day, May 11, 2011, for complaints of vomiting, diarrhea and epigastric pain. (R. at 475-76.) Lane was given a prescription for Phenergan and discharged. (R. at 476.) She returned to the Emergency Department on May 13, 2011, with complaints of vomiting and diarrhea for the previous week. (R. at 477-78.) Lane was diagnosed with gastroenteritis. (R. at 478.)

On May 2, 2011, Dr. Brian Strain, M.D., a state agency physician, completed a physical residual functional capacity assessment on Lane. (R. at 109-10, 123-24.) Dr. Strain stated that Lane was limited to occasionally lifting or carrying items weighing 20 pounds or less and frequently lifting or carrying items weighing 10 pounds or less. (R. at 109, 123.) He stated that Lane could stand or walk for a total of about six hours and could sit for about six hours in an eight-hour workday. (R. at 109, 123.) He stated that Lane also was limited to occasionally pushing and pulling items weighing 20 pounds or less and frequently pushing and pulling items weighing 10 pounds or less, (R. at 109, 123.) Dr. Strain stated that Lane could frequently climb ramps, stairs, ladders, ropes and scaffolds, balance,

stoop, kneel and crouch, but should avoid concentrated exposure to extreme heat, noise, vibration, fumes, odors, dusts, gases, poor ventilation and hazards, such as machinery and heights. (R. at 109-10, 123-24.)

On May 9, 2011, Jo McClain, a state agency professional counselor, completed a Psychiatric Review Technique form, ("PRTF"), indicating that Lane suffered from an affective disorder and substance addiction disorders. (R. at 107-08, 121-22.) She found that Lane had mild limitations on her ability to perform her activities of daily living and mild difficulties in her ability to maintain social functioning. (R. at 107, 121.) She reported that Lane had moderate difficulties in maintaining concentration, persistence or pace. (R. at 107, 121.) She opined that Lane had not experienced any episodes of decompensation of extended duration. (R. at 107, 121.)

That same day, McClain completed a mental assessment, indicating that Lane had no significant limitations in her ability to carry out very short and simple instructions; to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; to sustain an ordinary routine without special supervision; to work in coordination with or in proximity to others without being distracted by them; to make simple work-related decisions; to ask simple questions or request assistance; and to maintain socially appropriate behavior and to adhere to basic standard of neatness and cleanliness. (R. at 111-12, 125-26.) She opined that Lane was moderately limited in her ability to carry out detailed instructions; to maintain attention and concentration for extended periods; to

complete a normal workday or workweek without interruptions from psychologically based symptoms and to perform at a consistence pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; and to get along with co-workers or peers without distracting them or exhibiting behavioral extremes. (R. at 111-12, 125-26.) McClain stated that, due to her bipolar disorder, Lane would be limited to simple, nonstressful work with modest social demands. (R. at 112, 126.)

Lane was evaluated by Dr. Arun Rao, M.D., with Wellmont CVA Heart Institute, for bradycardia on June 24, 2011. (R. at 448-53.) Dr. Rao noted that Lane was nine weeks pregnant with a history of intermittent nausea and vomiting with transient bradycardia. (R. at 448.) Lane complained of a history of frequent numbness and shooting pains in her arms, which improved slightly following her spinal surgery the year previous. (R. at 448.) She also complained of occasional palpitations and intermittent dizziness associated with transient darkening of vision, but no chest discomfort, difficulty breathing or edema. (R. at 448.) Dr. Rao noted that Lane was 5 feet, 6 inches tall and weighed 232 pounds. (R. at 452.) Dr. Rao stated that he believed that Lane's bradycardia was "probably due to heightened vagal tone in the setting of nausea." (R. at 453.) He recommended additional evaluation with an event monitor to make sure her dizziness was not due to severe bradycardia. (R. at 453.) A Holter Monitor Report stated that Lane experienced one period with her heart rate at only 40 beats per minute. (R. at 456.) An echocardiogram, ("ECG"), performed on June 24, 2011, was essentially

normal. (R. at 454-55.)

Lane was seen in follow up on November 3, 2011. (R. at 816-18.) Dr. Rao noted that after seeing Lane in June, she had worn an event monitor for 30 days, which showed sinus rhythm to mild sinus tachycardia and that an ECG had shown normal heart function. (R. at 816, 820-21.) Dr. Rao noted that Lane was in jail from August 19 to October 13, 2011. (R. at 816.) She reported that, while in jail, her pulse rate would drop in the teens, and her blood pressure would be elevated on occasion. (R. at 816.) Dr. Rao noted that Lane was 27 weeks pregnant. (R. at 816.) She complained of occasional heart palpitations with mild chest discomfort, which would last for about 10 minutes and would resolve with rest. (R. at 816.) Dr. Rao noted that Lane's heart rhythm was regular and that an electrocardiogram, ("EKG"), showed sinus rhythm. (R. at 818.)

Dr. Rao saw Lane again on December 9, 2011, for complaints of chest pain. (R. at 813-14.) Dr. Rao noted that Lane was obese at 5 feet, 6 inches tall and weighing 280 pounds. (R. at 814.) He noted that Lane's cardiac rhythm was regular, and she had no swelling in her lower extremities. (R. at 813.) An EKG showed normal sinus rhythm. (R. at 813.) Lane also saw Dr. Rao on February 10, 2012, complaining of intermittent palpitations and "very atypical chest pain that only occurs at rest." (R.at 809-12.) Dr. Rao noted that Lane's heart rhythm was regular, and she had no swelling in her lower extremities. (R. at 811.)

On September 13, 2011, Dr. Joseph Duckwall, M.D., a state agency

physician, completed a physical residual functional capacity assessment on Lane. (R. at 154-56.) Dr. Duckwall stated that Lane was limited to occasionally lifting or carrying items weighing 20 pounds or less and frequently lifting or carrying items weighing 10 pounds or less. (R. at 154.) He stated that Lane could stand or walk for a total of about six hours and could sit for about six hours in an eight-hour workday. (R. at 154.) He stated that Lane also was limited to occasionally pushing and pulling items weighing 20 pounds or less and frequently pushing and pulling items weighing 10 pounds or less, (R. at 154.) Dr. Duckwall stated that Lane could frequently climb ramps, stairs, ladders, ropes and scaffolds, balance, stoop, kneel and crouch, occasionally crawl and should avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation and hazards, such as machinery and heights. (R. at 155-56.)

On September 15, 2011, Howard S. Leizer, Ph.D., a state agency psychologist, completed a PRTF indicating that Lane suffered from an affective disorder and substance addiction disorders. (R. at 152-53.) He found that Lane had mild limitations on her ability to perform her activities of daily living and mild difficulties in her ability to maintain social functioning. (R. at 153.) He reported that Lane had moderate difficulties in maintaining concentration, persistence or pace. (R. at 153.) He opined that Lane had not experienced any episodes of decompensation of extended duration. (R. at 153.)

That same day, Leizer also completed a mental assessment, indicating that Lane had no significant limitations in her ability to carry out very short and simple

instructions; to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; to sustain an ordinary routine without special supervision; to work in coordination with or in proximity to others without being distracted by them; to make simple work-related decisions; to ask simple questions or request assistance; and to maintain socially appropriate behavior and to adhere to basic standard of neatness and cleanliness. (R. at 156-57.) He opined that Lane was moderately limited in her ability to carry out detailed instructions; to maintain attention and concentration for extended periods; to complete a normal workday or workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; and to get along with co-workers or peers without distracting them or exhibiting behavioral extremes. (R. at 156-57.) Leizer stated that, due to her bipolar disorder, Lane would be limited to simple, nonstressful work with modest social demands. (R. at 157.)

Lane saw Dr. Michael on June 18, 2012, in an effort to get forms completed regarding her disability claims. (R. at 1320-21.) Dr. Michael noted that Lane had difficulty with weight control. (R. at 1320.) Lane reported improved pain and swelling in her left ankle. (R. at 1320.) Lane said she was not sure what she had done to hurt her ankle, but that she had gone to an emergency department and been given a brace to wear on it the previous Saturday. (R. at 1320.) Lane complained of being unable to concentrate on the computer for more than 10 minutes. (R. at 1320.) She said she was not driving due to the number of speeding tickets she had

received. (R. at 1320.) The list of Lane's medications on this date does not include any psychiatric medication. (R. at 1321.)

Dr. Michael noted good rotation in Lane's back and normal range of motion in her spine, shoulders, elbows, wrists, hips, knees and right ankle. (R. at 1321.) Dr. Michael noted that Lane was alert and oriented, and her neurologic exam was essentially normal. (R. at 1321.) Dr. Michael diagnosed Lane with a sprained ankle and recommended exercise and physical therapy. (R. at 1321.) Lane said that her lawyer was sending her for a psychological evaluation. (R. at 1321.)

On July 2, 2012, B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist, evaluated Lane at the request of Lane's attorney. (R. at 508-17.) Lane reported that she smoked half a pack of cigarettes a day and had used marijuana and crack cocaine in the past. (R. at 510.) Lane told Lanthorn that she had stopped using illicit drugs "many years ago." (R. at 510.) Lane said that she used to drink alcohol every other day and had blackouts, as well as having developed a tolerance. (R at 510.) Lane said that she had been convicted of theft and drug distribution and was on probation. (R. at 510.)

Lane complained of significant pain in her head, neck and lower back. (R. at 510.) She also complained of pain "all over all the time." (R. at at 510.) Lane said that she had been psychiatrically hospitalized on one occasion at Woodridge in 2008 for five to seven days after a suicide attempt. (R. at 511.) She stated that she had treated with Kaye Weitzman, a licensed clinical social worker, for

approximately one year and also had been seen at Wise County Behavioral Health Services, but was not then receiving any psychiatric or psychotherapeutic intervention. (R. at 511.)

Lanthorn noted that, at the time of his evaluation, Lane was 5 feet, 6 inches tall and weighed 300 pounds. (R. at 512.)  Lanthorn stated that he reviewed records showing that Lane had been diagnosed with and treated for numerous conditions including joint pain, lower back pain, meniscus tear in the knee, bipolar disorder, Chiari's network, morbid obesity, chronic ACL tear, possible schizophrenia, chronic headaches, herniated discs and pain in her thoracic and lumbar spine with degenerative disc disease, carpal tunnel syndrome, chronic fatigue, fibromyalgia, arthritis, possible adult attention deficit hyperactivity disorder, mood swings and history of cannabis abuse and hypoglycemia. (R. at 511.)

Lanthorn noted that Lane walked without apparent difficulty and made good eye contact. (R. at 512.) He stated that Lane exhibited no signs of ongoing psychotic processes nor any evidence of delusional thinking. (R. at 512.) He stated that Lane was adequately groomed. (R. at 512.) Lanthorn stated that Lane's affect was mixed, with her exhibiting the normal range of expression at times and, at other times, her expression was flat, and she would speak in a monotone. (R at 512.) Lane told Lanthorn that she had been "depressed for as long as I can remember." (R. at 512.)  She said that she felt constantly drained and fatigued, but she admitted that she would sleep as little as three to four hours a night. (R. at 512.) Lane reported that she cries at times and often feels worthless and useless.

(R. at 512.)

Lane complained of short-term memory problems. (R. at 512.) Nonetheless, Lane was able to recall three out of five words presented earlier to her. (R. at 513.) She said that her concentration was adequate most of the time, but she said her mind wandered at times, and she found it hard to follow through on tasks. (R. at 512.) Lane said that she was often irritable and moody and could go from relatively calm to very angry or upset. (R. at 512.) Lane said that she was often very anxious, worried, tense and fretted a great deal. (R. at 512.)

Based on intelligence testing, Lanthorn stated that he believed Lane's full-scale IQ score would fall between 92-100. (R. at 513.) Lanthorn stated that Lane's results on the Minnesota Multiphasic Personality Inventory – 2, ("MMPI-2"), showed that Lane was highly anxious, worried, tense, experiencing significant emotional discomfort and easily agitated. (R. at 514-15.) Lanthorn said the test results showed that Lane was experiencing moderate to severe personal distress characterized by dysphoria, agitations, worry and anhedonia. (R. at 515.) He said that the results also showed that Lane was having difficulty concentrating and focusing her attention and was likely to have poor judgment. (R. at 515.) He said that it also showed that she was very uncomfortable around other people and that her behavior was likely to be unpredictable and inappropriate at times. (R. at 515.)

Lanthorn diagnosed Lane as suffering from a generalized anxiety disorder; major depressive disorder, recurrent, moderate; polysubstance dependence in

sustained full remission; a personality disorder; and with a need to rule out somatization disorder, not otherwise specified. (R. at 515-16.) Regarding Lane's history of polysubstance abuse, Lanthorn incorrectly stated that Lane "appears to have stopped this altogether many years ago." (R. at 516.) He placed Lane's then-current GAF score at 55. (R. at 516.) He stated that Lane's allegations of psychologically disabling conditions were found to have "partial validity." (R. at 516.)

On July 2, 2012, Lanthorn completed a mental assessment, indicating that Lane had only a fair, or seriously limited, ability to perform all occupational, performance and personal/social adjustments. (R. at 518-20.) He stated that Lane would be absent from work more than two days a month based on her impairment. (R. at 520.)

Lane saw Mitchell again on July 9, 2012, and complained of chronic headaches, but no muscle, joint, back or mental health problems. (R. at 1317-19.) Lane saw Dr. Michael on July 26, 2012, for follow up for her bipolar disorder. (R. at 1314-16.) Lane complained of fatigue and weight gain. (R. at 1314.) Dr. Michael noted that Lane weighed 318 pounds. (R. at 1315.) Lane said that she was tolerating Lamictal, but her mood could be "all over the place," and she wanted to restart Seroquel. (R. at 1314.) Dr. Michael noted some trace edema in Lane's extremities. (R. at 1315.) Dr. Michael diagnosed hyperglycemia and bipolar disorder. (R. at 1315.) It appeared that Lane's blood test results showed that the level of Lamictal in her blood was not at a therapeutic level. (R. at 1315.)

Lane returned to the UVA Neurology Clinic on July 5, 2012, and saw Dr. Jeffrey Ratliff, M.D., for follow up for headaches. (R. at 1222-24.) Lane stated that she had stopped taking Elavil. (R. at 1223.) Lane complained of two types of headaches. (R. at 1223.) The more common headache she described as a feeling of motion sickness with mild, dull, posterior pain associated with lightheadedness and nausea. (R. at 1223.) She reported that she experienced this type of headache three to four times a week. (R. at 1223.) The other she described as sharper with a throbbing quality, but still in the posterior of her head with radiation into the left side. (R. at 1223.) Lane said that both types of headaches would last for six to eight hours and were associated with phonophobia and photophobia. (R. at 1223.) Lane said that her headaches were helped by lying in a dark room with a damp cloth on her head. (R. at 1223.) Lane also complained of a transient loss of vision lasting only a few seconds approximately twice monthly, not associated with headache. (R. at 1223.)

Dr. Ratliff stated that Lane's examination was normal with full strength in her extremities with no involuntary movements, sensation intact to light touch, reflexes equal and symmetric and a normal gait. (R. at 1224.) Dr. Ratliff prescribed Lamictal, but recommended that Lane not become pregnant while taking it. (R. at 1224.)

On August 2, 2012, Lane returned to Dr. Carson at UVA for complaints of pain in her knees. (R. at 1221.) Dr. Carson noted that Lane was seen on July 5, 2012, for pain in her left knee with possible meniscus pathology. (R. at 1221.)

Lane complained of right knee pain for the preceding few weeks that was getting progressively worse. (R. at 1221.) Lane described pain on the anterior part of the knee, which was worse when climbing stairs or with uphill/downhill walking with occasional episodes of giving away. (R. at 1221.) Lane said she would take nonsteroidal anti-inflammatory drugs on occasion for pain control. (R. at 1221.) Dr. Carson's examination of both knees was basically negative. (R. at 1221.) Dr. Carson noted that an MRI of Lane's left knee taken on July 6, 2012, showed severe truncation of the body and posterior horn of the medical meniscus, which likely was secondary to a combination of previous surgery and degeneration, a complete tear of the ACL, a large area of full-thickness cartilage loss within the medial tibial plateau, moderate tricompartmental osteophytosis and prominent patellar tilt and subluxation. (R. at 1221-22, 1226.) Dr. Carson diagnosed left knee osteoarthritis and recommended an injection in Lane's knee, that she continue physical therapy and that she lose weight. (R. at 1222.)

On March 16, 2011, counselor Odle completed a work-related mental assessment, indicating that Lane had an unlimited ability to understand, remember and carry out simple job instructions, a good or satisfactory ability to follow work rules, to function independently, to understand, remember and carry out detailed and complex job instructions, to maintain personal appearance and to demonstrate reliability, a fair or seriously limited ability to relate to co-workers, to deal with the public, to use judgment with the public, to interact with supervisors, to maintain attention and concentration, to behave in an emotionally stable manner and to relate predictably in social situations and no useful ability to deal with work

stresses. (R. at 746-48.) Odle stated that Lane had problems with anger management, difficulty maintaining appropriate interaction when stressed and some difficulty with memory. (R. at 747.) Odle said that Lane had been diagnosed with bipolar disorder and was being further evaluated for adult attention deficit hyperactivity disorder, ("ADHD"). (R. at 748.) She said she would anticipate that Lane would be absent from work more than two days a month. (R. at 748.)

Lane saw Kaye Weitzman, a licensed clinical social worker with Solutions Counseling, LLC, on November 29, 2011. (R. at 1341.) Lane complained of crying spells and being paranoid about the upcoming birth of her daughter. (R. at 1341.) Lane said her pregnancy had brought up a lot of "stuff" from her past. (R. at 1341.) Weitzman stated that Lane was experiencing moderate depression, moderate anxiety, substance abuse, moderate irritability, moderate crying spells, increasing moderate panic attacks, decreased energy, steady appetite, steady sleep and steady attention/concentration with no suicidal or homicidal ideations. (R. at 1341.) Weitzman noted that Lane's mood was depressed and irritable with an anxious affect. (R. at 1341.) She stated that Lane was oriented, with racing thought process, transient paranoia/delusions and fair judgment/insight. (R. at 1341.)

On December 22, 2011, Lane told Weitzman that she was scheduled to deliver her daughter by C-section on January 18, 2012. (R. at 1340.) Lane complained of "too much stress." (R. at 1340.) She said that her niece had been hitting and kicking her in her belly. (R. at 1340.) Lane's complaints and Weitzman's observation were consistent with those noted on November 29, 2011,

except she denied paranoia and delusions. (R. at 1340.) On January 31, 2012, Lane told Weitzman that she had delivered her daughter. (R. at 1339.) Lane said that she felt bad, but she kept going. (R. at 1339.) She said that she wanted to sleep all the time. (R. at 1339.) Lane said that she was experiencing odd pains, and she thought that her C-section had not gone well. (R. at 1339.) Weitzman noted that Lane was experiencing mild depression, mild anxiety, questionable substance abuse, moderate irritability/anger, mild crying spells, mild panic attacks, decreased energy and increased sleep. (R. at 1339.) Weitzman noted that Lane stated that she was doing better with less depression and less panic. (R. at 1339.)

On June 19, 2012, Lane told Weitzman that she was doing "OK," even though her sister was near death due to kidney failure. (R. at 1338.) Lane said that she was wearing a "boot" due to a left ankle fracture. (R. at 1338.) Weitzman noted moderate depression, mild anxiety, mild irritability/anger, mild crying spells and mild panic attacks. (R. at 1338.) Lane stated that her energy, appetite, sleep and attention/concentration all were stable. (R. at 1338.) On July 18, 2012, Lane told Weitzman that things were going well with her boyfriend, and her family was doing well. (R. at 1337.) Lane said that she had put her infant daughter in a beauty contest and cried when she did not win. (R. at 1337.) Lane said that her depression, anxiety and panic attacks were stable with increased irritability/anger and crying spells and decreased energy and sleep. (R. at 1337.)

On August 23, 2012, Lane saw Dr. Michael for allergy testing. (R. at 1310-13.) Lane said that whenever she would eat shrimp, she became flushed and got

hot. (R. at 1310.) Lane saw Dr. Michael again on August 29, 2012, complaining of right lower quadrant abdominal pain. (R. at 1307-09.) Dr. Michael gave Lane a prescription for an antibiotic in case she had a urinary tract infection and told her to strain her urine to see if she passed a kidney stone. (R. at 1308.) On September 4, 2012, Lane complained of low back pain, said she woke up with her kidney killing her, but she did not pass a stone. (R. at 1304-06.) Dr. Michael noted that Lane was able to quickly get up onto and off of the exam table, moving well. (R. at 1305.) Lane returned to see Sparks on September 24, 2012, complaining of left knee pain and pain in her feet. (R. at 1301-03.) Lane said that she had been walking a lot more lately. (R. at 1301.) Sparks recommended that Lane obtain proper fitting walking shoes and take ibuprofen for knee or foot pain as needed. (R. at 1302.) She recommended Lane lose weight also. (R. at 1302.) X-rays of Lane's right foot showed no evidence of fracture, dislocation or bony destruction. (R. at 1329.)

On October 1, 2012, Dr. Michael restarted Lane on Seroquel. (R. at 1300.) Dr. Michael noted that Lane weighed 323 pounds, and he counseled her on working on her diet and regular exercise of walking at least 20 minutes once a day or 10 minutes twice a day. (R. at 1298-99.) On October 11, 2012, Lane saw Mitchell, complaining of pain in the lower abdomen and left knee with swelling and giving out. (R. at 1293-96.) Lane complained that her left knee pain was constantly aching and throbbing. (R. at 1293.) Lane said that she had recently passed a kidney stone, but that her current abdominal pain started afterward. (R. at 1293.) Mitchell noted some crepitus in the left knee with tenderness, but no erythema or warmth. (R. at 1295.) X-rays taken of Lane's left knee on October 11,

2012, showed moderate to severe medial compartment degenerative change with mild progression since November 30, 2009, and mild lateral and patellofemoral compartment degenerative change with no effusion. (R. at 1328.)

On October 17, 2012, Lane told Weitzman that she was raising money for her sister's kidney transplant. (R. at 1336.) Lane vented about paranoia and unnatural fears; she said that she had lots of stress about personal and family health issues. (R. at 1336.) Lane complained of increasing mild depression, stable moderate anxiety, stable moderate irritability/anger, increasing mild crying spells, increasing panic attacks and decreased energy. (R. at 1336.) Lane said, "I am trying to make it with all my stress but it is harder and harder." (R. at 1336.)

Lane saw Dr. Michael on November 20, 2012, complaining of left knee pain which worsened the previous night. (R. at 1289-90.) Lane stated that "something happened" when she stood up the previous night. (R. at 1289.) Lane denied any swelling, redness, warmth, locking or buckling of the knee. (R. at 1289.) Dr. Michael noted that there was no swelling or redness in Lane's knee and that she had full range of motion with pain medially, no crepitus, but tenderness on palpation on the medial collateral ligament. (R. at 1289.) Dr. Michael diagnosed a sprained medial collateral ligament and prescribed naproxen. (R. at 1289.)

On November 27, 2012, Lane told Weitzman that she had taken her daughter to the Santa Train but that her niece and nephew were very ill-behaved and ruined the holiday for all of them. (R. at 1335.) Lane said that she was frustrated by lots of

family stress. (R. at 1335.) Lane said her mother had fallen and broken her arm. (R. at 1335.) Lane complained of moderate stable depression, increasing moderate anxiety, increasing moderate irritability/anger, increasing moderate crying spells, stable moderate panic attacks, decreased energy and stable appetite, sleep and attention/concentration. (R. at 1335.)

Lane was seen by Sparks for complaints of sinus congestion and blisters on her feet on March 20, 2013. (R. at 11-13.) On this occasion, Lane denied any tingling or numbness in or radiation of pain to her feet. (R. at 11.) Sparks noted that Lane weighed 326 pounds. (R. at 12.) Lane saw Mitchell on April 11, 2013, for pain in her left foot after hitting her little toe. (R. at 8-9.) Neither of these reports note any complaints of overall body pain or back or neck pain, other than to note that Lane was taking Lortab for her back. (R. at 8-9, 11-13.)

Lane was treated by Dr. Felix Shepard Jr., M.D., a urologist, for kidney stones in 2012-2013. (R. at 1250-66.)

Lane was seen by Timothy Marquell, a physician's assistant at Washington County Medical Clinic, on October 23, 2012, for complaints of low back pain and pain management. (R. 1277-81.) Lane complained of pain, at rest, at a level two on a 10-point scale that radiated into her hips bilaterally and down her legs to the ankles. (R. at 1277.) At another point in his report, it states that Lane complained of pain at a level eight on a 10-point scale. (R. at 1279.) Lane claimed that she had suffered from low back pain since she was 10 years old, but she said that it had

worsened over the years. (R. at 1277.) Lane said that she was working on a farm and also had to lift her handicapped brother as a caregiver. (R. at 1277.) She denied any known injury or any other chronic, long-term medical condition. (R. at 1277.)

Lane stated that standing or sitting for prolonged periods, bending and walking caused pain. (R. at 1277.) She claimed she also had pain radiating down her right arm. (R. at 1277.) She described the pain as constant, dull, aching, shooting and tingling. (R. at 1277.) Lane said that, due to pain, she had avoided work activities, yard work/shopping, recreation, exercise, housework, socializing, sexual activity and driving during the previous month. (R. at 1277.) Lane stated that physical therapy, exercise, muscle relaxants and aspirin provided no relief for her pain. (R. at 1277.)  She said that heat, chiropractic treatment, corticosteroid injections and epidural injections provided moderate relief. (R. at 1277.) Lane claimed that she was unable to walk for more than 100 feet, stand for more than 10 minutes or sit for more than 10 minutes. (R. at 1278.)

Lane complained of blurry vision, ringing in her ears, heart palpitations, shortness of breath, nausea, abdominal pain, diarrhea, kidney stones, muscle weakness, easy bleeding and tendency for easy bruising, hand joint swelling, lower back pain, ankle joint swelling, muscle cramps, joint stiffness, dizziness, difficulty walking, tingling and numbness, anxiety, depression and sleep disturbance. (R. at 1278.) Marquell noted that palpation of Lane's thoracic and lumbosacral spine revealed "abnormalities." (R. at 1279.) He noted that Lane was 5 feet, 5 inches tall and weighed 320 pounds. (R. at 1279.)

Marquell noted that Lane's general appearance was normal, and she was oriented to time, place and person. (R. at 1279.) Her heart rate and rhythm were normal. (R. at 1279.) He stated that Lane's lumbar spine motion was abnormal, with palpation of the left sacroiliac joint exhibiting tenderness. (R. at 1279.) Straight leg raising tests were normal. (R. at 1279.) Valsalva and Kemp's testing of the lumbar spine were negative. (R. at 1279.) Lane's muscle bulk and tone were normal with no lumbosacral spine, lower extremity or hip weakness observed. (R. at 1280.) Marquell noted that Lane's gait was "shuffling." (R. at 1280.) He diagnosed sacroiliitis, lumbago, morbid obesity and thoracic spine pain. (R. at 1280.)

Lane saw Marquell again on November 9, 2012, (R. at 1276), and on March 29, 2013, for complaints of back pain. (R. at 15-17.) Lane denied receiving pain medications from any other healthcare providers and denied illegal drug use. (R. at 15.) Lane reported constant, dull, aching back pain, which affected her quality of life. (R. at 15.) Marquell noted that he found no tenderness on palpation of Lane's thoracic transverse process on either side, but he did note that Lane's lumbosacral spine exhibited tenderness on palpation of the transverse process, which he stated was mild to moderate. (R. at 16.) He found no tenderness in Lane's sacroiliac joint. (R. at 16.) Marquell prescribed Flexeril, meloxicam and hydrocodone-acetaminophen. (R. at 16.)

X-rays of Lane's right ankle taken on December 7, 2012, showed a distal fibular fracture with probable involvement of the distal tibiofibular syndesmosis.

(R. at 1325.)  Lane saw Dr. Eric D. Parks, M.D., with Watauga Orthopaedics, on December 10, 2012, for a right ankle fracture she sustained on December 7, 2012, when she fell down stairs backwards.  (R. at 1284-85.) Lane reported constant pain in the seven to eight point range on a 10-point scale, swelling and numbness in her toes. (R. at 1284.) Lane was weightbearing, and she said that prolonged walking or standing and climbing or descending stairs made her pain worse. (R. at 1284.)

Lane saw Dr. Parks again on December 20, 2012, for follow up. (R. at 1283.) Dr. Parks noted that Lane had been weight bearing some on the ankle despite his recommendation to be completely nonweightbearing. (R. at 1283.) Lane stated that she was helping her mother take care of a sibling. (R. at 1283.) Lane said that she had a fall three days earlier, with a temporary increase in pain for which she was taking Percocet. (R. at 1283.) Dr. Parks stated that physical examination showed normal alignment of her right ankle with improved swelling, no obvious neurovascular deficits and tenderness at the lateral malleolus. (R. at 1283.) Dr. Parks noted that, despite Lane's noncompliance with instructions, her fracture had not displaced, and he stressed the need for complete compliance with nonweightbearing. (R. at 1283.) Dr. Parks stated that he had received disability papers from Lane's attorney to complete, but that Lane's injury was not the type of injury that should result in disability. (R. at 1283.)

On December 22, 2012, Lane sought treatment at Indian Path's Emergency Department for hip pain, which she thought was the result of walking in the boot placed on her fractured ankle. (R. at 1354-58.) Lane was diagnosed with bursitis.

(R. at 1358.)

Lane saw Dr. Michael again on December 26, 2012, for pain in her right hand from trauma. (R. at 1287.) Dr. Michael diagnosed a fracture of the fifth metacarpal bone of the right hand. (R. at 1287.) He placed her in a wrist splint and recommended an orthopedic referral. (R. at 1287.) X-rays of Lane's right hand taken on December 28, 2012, showed a boxer's fracture of the neck of the right fifth metacarpal. (R. at 1324.)

Lane saw Dr. Jeffrey A. Marchessault, M.D., an orthopedic physician, for complaints of right hand pain on December 28, 2012. (R. at 1368.) Lane gave a history of striking a friend on his knee, with immediate pain and inability to grasp with the right hand. (R. at 1368.) Lane stated that her pain was adequately controlled by medication. (R. at 1368.) Dr. Marchessault noted that Lane was alert and oriented, pleasant and cooperative. (R. at 1368.) On examination, she was tender to palpation with moderate swelling over the dorsum of her right hand. (R. at 1368.) She had no abrasions and no malrotation of the finger, but she was tender to palpation over the right fifth metacarpal head with loss of metacarpal head prominence. (R. at 1368.) Dr. Marchessault stated that x-rays showed a volarly angulated fifth metacarpal neck fracture. (R. at 1368.) He placed a short arm cast on Lane and asked her to return in two weeks. (R. at 1368.)

Lane returned to Dr. Marchessault for follow up on January 14, 2013. (R. at 1367.) Dr. Marchessault stated that x-rays showed no appreciable change in the

angulation or displacement of the fracture. (R. at 1367.) Lane was able to make a composite fist with complaints of tightness and was tender over the fifth metacarpal head. (R. at 1367.) Dr. Marchessault placed her in another cast for two additional weeks. (R. at 1367.)

On January 28, 2013, Weitzman completed a mental assessment of Lane's work-related capabilities. (R. at 1370-72.) Weitzman opined that Lane had poor to no ability to perform all occupational, performance and personal/social adjustments, with the exception of a fair to poor ability to understand, remember and complete simple job instructions. (R. at 1370-71.) Weitzman stated "Jessica has major family & health issues. She is an inadequately medicated bipolar who also has [post-traumatic stress disorder]. Her mood/temper/concentration are all unstable. (R. at 1372.) Weitzman stated that Lane would miss more than two days of work a month due to swelling in her extremities and high blood pressure. (R. at 1372.) She stated that Lane's physical and mental health were "very unstable." (R. at 1372.)

On Weitzman's January 29, 2013, counseling note, she stated that Lane said she had fallen and broken her right ankle and had broken her right hand when she hit her nephew during a family argument. (R. at 1374.) Weitzman noted that Lane was decompensating because of increased pain and family stress, and she recommended referral to a psychiatrist. (R. at 1374.) Lane complained of increased depression, anxiety, irritability/anger, crying spells and panic attacks. (R. at 1374.) Weitzman stated that Lane's mood was depressed and irritable, her affect was

anxious, her orientation was intact, her thought process was racing, and she had transient paranoia/delusions and fair judgment/insight. (R. at 1374.)

Lane was seen by Dr. Rao again on February 21, 2013, for heart arrhythmias. (R. at 1380-82.) Lane also complained of atypical chest pains with intermittent high blood pressure. (R. at 1380.) Dr. Rao noted that Lane weighed 324 pounds. (R. at 1381.) Her blood pressure was 121/77. (R. at 1381.) Dr. Rao diagnosed Lane with atypical chest pain, unlikely of cardiac origin, and mild sinus bradycardia. (R. at 1382.) Dr. Rao told Lane to keep a record of her blood pressure and show to Dr. Michael on her next visit. (R. at 1382.) He also advised her to lose weight. (R. at 1382.)

Dr. Parks reviewed February 28, 2013, x-rays of Lane's right ankle and stated that the fracture line was still visible on the lateral view, although there was some bridging callus formation noted. (R. at 1385.) Lane saw Marquell again on March 1, 2013, for low back pain. (R. at 1387-89.) Lane denied receiving pain medication from other providers, taking any illegal substances or experiencing any side effects from opiates. (R. at 1387.) Lane complained of constant, dull, aching pain that was significantly affecting her quality of life. (R. at 1387.) Marquell noted that Lane's lumbar spine motion was normal, but that palpation of her lumbosacral spine revealed "abnormalities." (R. at 1387.) Marquell noted moderate tenderness on the transverse process of Lane's lumbosacral spine on both sides and tenderness on her sacrum with palpation. (R. at 1388.) Lane's blood pressure was 125/85, and her heart rate and rhythm was normal. (R. at 1387.) A urine drug

screen was negative. (R. at 1388.) Marquell prescribed hydrocodone-acetaminophen 7.5-325 mg., Flexeril and meloxicam. (R. at 1388.)

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2015). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2015).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See*

*Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(c), 416.927(c), if he sufficiently explains his rationale and if the record supports his findings.

Lane argues that the ALJ improperly determined her residual functional capacity. (Plaintiff's Memorandum In Support Of Her Motion For Summary Judgment, ("Plaintiff's Brief"), at 5-7.) Lane also argues that the ALJ's finding that a significant number of other jobs existed that she could perform is not supported by substantial evidence. (Plaintiff's Brief 8-9.)

The ALJ found that Lane had the residual functional capacity to perform sedentary work that would allow her to change positions briefly between sitting and standing, that would not require walking or standing for more than 15 minutes at a time, that did not require her to climb, kneel or operate foot controls, that required no more than occasional stooping or crouching and that allowed frequent, but not constant, reaching, handling and fingering. (R. at 26.) The ALJ also found

that Lane should avoid heights and machinery and was limited to short, simple instructions with no close proximity to crowds of unfamiliar persons. (R. at 26.)

In her brief, Lane argues that the ALJ erred by giving less weight to the opinions of mental health workers Odle and Weitzman, psychologist Lanthorn and chiropractor Levesque. In his decision, the ALJ considered the opinions of each of these health care providers. (R. at 26-32.) The ALJ noted that, in March 2011, Odle had opined that Lane had a poor or no ability to deal with work stresses and a fair ability to relate to co-workers, to deal with the public, to use judgment with the public, to interact with supervisors, to maintain attention and concentration, to behave in an emotionally stable manner and to relate predictably in social situations. (R. at 30, 746-48.) The ALJ discounted Odle's opinions because he found they were inconsistent with Odle's own progress notes and the other evidence of record. (R. at 30.) The ALJ noted that, in January 2013, Weitzman had opined that Lane had a poor or no ability to perform all work-related mental activities, with the exception of understanding, remembering and carrying out simple job instructions. (R. at 30, 1370-72.) The ALJ discounted Weitzman's opinions because he found that the serious limitations she placed on Lane's work-related mental abilities were not reflected in her counseling notes. (R. at 30.) The ALJ noted that Lanthorn, in July 2012, opined that Lane had a fair ability to function in all work-related areas, which was defined as the "ability to function in this area is seriously limited resulting in unsatisfactory work performance." (R. at 30, 517-19.) The ALJ discounted Lanthorn's opinions contained in his assessment because he found that they were inconsistent with his findings and opinions

-69-

contained in his narrative report. (R. at 31.) The ALJ noted that Levesque, in February 2011, had opined that Lane could not stand or walk for more than 15-20 minutes or sit for longer than 20-30 minutes at a time, perform any fine motor skills, such as typing or writing, or grasp, pinch, hold or carry items weighing more than five to 10 pounds. (R. at 31, 933-43.) The ALJ gave Levesque's opinions little weight because, as a chiropractor, Levesque is not an acceptable medical source, *see* 20 C.F.R. §§ 404.1513(a), 416.913(a), and his opinions were based on Lane's subjective complaints and not supported by the objective medical evidence of record. (R. at 31.)

The ALJ noted that he was giving some weight to the state agency psychologists and physicians in determining Lane's residual functional capacity. (R. at 23.) The regulations fully permit an ALJ to rely upon the opinions of the state agency physicians in determining a claimant's residual functional capacity. *See* 20 C.F.R. §§ 404.1527(e), 416.927(e) (2015) (providing for the consideration of opinions of medical and psychological consultants and other nonexamining physicians and psychologists). The ALJ's reliance on state agency experts' opinions is appropriate. *See Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011) (explaining that the opinions of state agency medical consultants merit significant consideration because they are experts in Social Security disability evaluation).

Based on my review of the record, I find that substantial evidence supports the ALJ's weighing of the medical and psychological evidence. I also find that

substantial evidence supports the ALJ's findings with regard to Lane's residual functional capacity. I have set out the medical evidence contained in the record in this case at length in an effort to show that that I have considered it in its entirety. Despite seeing numerous physicians for numerous conditions, the only physical health care provider to place any long-term restrictions on Lane's work-related activities was chiropractor Levesque. I agree with the ALJ that it appears Levesque's restrictions were based more on Lane's subjective complaints than reference to her voluminous medical records, which do not document severe spine and joint problems.

To the contrary, the medical evidence shows that, some years ago, Lane decided that she no longer wished to work because she was needed to help care for a disabled brother at home. (R. at 985.) Since that time, Lane has attempted to build her claims for disability benefits, despite the fact that her health care providers have told her that they did not consider her impairments disabling. For instance, Lane's treating psychiatrist, Dr. Wisdom-Schepers, stated in 2008, only a month after Lane's discharge from inpatient psychiatric care, that Lane was "not psychiatrically disabled." (R. at 985.) In 2012, Lane's treating orthopedist, Dr. Parks, also stated that Lane was not disabled. (R. at 1283.)

Also, the record shows that Lane has repeatedly failed to follow treatment plans that would limit the effects of her impairments. For instance, Lane continued to smoke marijuana after being released from inpatient psychiatric treatment. (R. at 434, 658, 976, 981, 984, 999, 1051, 1054.) Despite doing well on her psychiatric

medications, with no reported side effects, Lane often stopped her medications. (R. at 972, 975, 1132, 1160.) Lane, on at least one occasion, also stopped taking medication prescribed for her chronic headaches. (R. at 1223.) After surgery on her left knee in 2010, it was recommended that Lane participate in physical therapy, but Lane told her treating physician that she had "no interest in doing so." (R. at 610.) After breaking her right ankle in 2012, Lane ignored medical advice not to weightbear for a period of time. (R. at 1283.) Also, Lane has repeatedly ignored medical advice to lose weight to improve her complaints of body and joint aches and pains. (R. at 1011, 1299.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986).

Based on these reasons, I find that substantial evidence supports the ALJ's weighing of the medical evidence and his finding as to Lane's residual functional capacity. I also find that substantial evidence supports the ALJ's finding that other jobs existed that Lane could perform and, therefore, Lane was not disabled. The transcript of Lane's hearing shows that the ALJ provided a hypothetical to the vocational expert, which adequately set forth his findings as to Lane's residual functional capacity, as well as her age, education and work history. Testimony of a vocational expert constitutes substantial evidence for purposes of judicial review where his or her opinion is based upon a consideration of all the evidence of record and is in response to a proper hypothetical question which fairly sets out all of a claimant's impairments. *See Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989).

An appropriate Order and Judgment will be entered.

ENTERED: March 28, 2016.

_s/ Pamela Meade Sargent_
UNITED STATES MAGISTRATE JUDGE